S. HELENE SADACCA, Plaintiff-Appellee, v. MARY MONHART, Defendant and Counterplaintiff-Appellant (S. Helene Sadacca, *et al.*, Counterdefendants-Appellees).

First District (4th Division)   No. 83—1531

Opinion filed October 25, 1984.

William R. Yowell, of Chicago, for appellant.

Nathan M. Cohen and Joel S. Siegel, both of Arvey, Hodes, Costello & Bruman, of Chicago, for appellee S. Helene Sadacca.

Jerry D. Jones and Susan M. McCowin, both of Wilson & McIlvaine, of Chicago, for appellee David M. Hartigan.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Defendant, Mary Monhart, appeals from the decision of the circuit court of Cook County entering judgment in the amount of $107,988.25 in favor of plaintiff, Helene Sadacca, in her action to quiet title to certain real estate. On appeal, Monhart claims that (1) Sadacca presented insufficient evidence of forgery to overcome the presumption that a duly acknowledged deed is valid; (2) the trial court erred in refusing to impose a constructive trust in Monhart's favor on certain funds received by Sadacca; (3) the trial court erred in discharging the administrator of Albert Sadacca's estate; and (4) entry of a money judgment in favor of Sadacca was error because there was no privity between the parties and no breach of duty by Monhart.

We reverse the decision of the trial court.

FACTS

Testimony at trial established that on May 9, 1980, Mary Monhart and her husband entered into a contract with Albert Sadacca, husband of plaintiff Helene Sadacca, to purchase the Sadaccas' condominium unit located at 175 East Delaware, Chicago (the John Hancock Building), for $255,000. Although the Sadaccas held the unit in joint tenancy, Albert alone had signed the real estate listing agreement and the contract of sale.

Since 1960, while Albert lived in Chicago, Helene maintained as her residence a condominium unit in Miami, Florida. Originally, Helene came to Chicago for six months of each year, but for the five years prior to this action she was too ill to leave Florida. During this period, Albert usually sent Helene a monthly allowance of $3,500.

At the closing of the sale in June 1980, Kenneth Jacobson, the Monharts' attorney, turned over the balance of the purchase price, $215,976.59, and received in exchange a deed, on its face executed by Albert and Helene and acknowledged by Morris Goldman, Albert's attorney. Jacobson testified that the entire purchase price was paid to Albert because Goldman had verbally instructed him to have the check made out to Albert alone.

Albert then deposited $15,976.59 in his checking account and purchased a $200,000 short-term certificate of deposit with the balance of the sale proceeds. He subsequently cashed the certificate of deposit and, over a period of five months, purchased successively smaller certificates while depositing the balance in his checking account. He also sent Helene $3,500 in each of the five months following the sale. On December 4, 1980, when Albert died, a $100,000 certificate of deposit remained, which was cashed by the administrator of Albert's estate at

the direction of the court in order to give Helene a $75,000 widow's award.

When Helene discovered the purported sale of the Hancock Building unit during an examination of Albert's papers, she brought an action to quiet title to the property, claiming that she had not signed the deed, that her signature had been forged, and that she had received no consideration, and asserting title to the unit as the surviving joint tenant of Albert. Mary counterclaimed for the imposition of a constructive trust on funds received by Helene and entry of judgment in Mary's favor against the administrator of Albert's estate for $120,738.30, one-half the net value of the sale proceeds, for Albert's breach of contract in not conveying full title. Originally, Mary had filed her claim against Albert's estate in the probate division, but she joined the administrator as a defendant in her counterclaim after Helene filed her quiet title action in chancery.

At trial, Donald Doud, an examiner of questioned documents, testified that Helene could not be identified as having signed the deed and that he felt very strongly that she had not. However, he could not positively identify Albert as the person who had signed Helene's name, although Albert's writing was more compatible with the forged signature than was Helene's.

The majority of the testimony of both Helene and Morris Goldman, Albert's attorney and the notary who had acknowledged the deed, was presented through evidence depositions. According to Helene, she had known Goldman for over 10 years, and he had been a dinner guest of the Sadaccas. She maintained that she had never come to Chicago during the period of time surrounding the sale and had never signed any deed.

Goldman, in contrast, stated that he did not know Helene well, that he had seen her only a few times, and that when he suggested to Albert that the deed be sent to Helene in Florida for her acknowledged signature, Albert had told him that Helene was coming to Chicago and would sign the deed when she arrived. According to Goldman, when he arrived at the Sadacca's apartment, he was shown into the bedroom because Helene was in bed, and he had her sign the deed there.

Goldman's evidence deposition was further contradicted by Jerome Zurla, administrator of Albert's estate. Zurla testified that when he called Goldman to inform him of Helene's allegation that her signature on the deed had been forged, Goldman said, "Oh, my God. The old man just handed me the document, and I notarized it." To Zurla's question, "Did you see Mrs. Sadacca?" Goldman replied, "No.

I just took it for granted that she signed it, and I just notarized it. I think I'm in a lot of trouble." Zurla further testified that he knew from his personal knowledge that Helene was not in Chicago during June and July of 1980.

Following the close of testimony, the trial court found that Albert had signed a warranty deed that also contained a forged signature purporting to be that of Helene; that Albert had received the net amount of $215,976.59 as sale proceeds; that Helene knew nothing of the sale and had received none of her share of the consideration, $107,988.25; that Albert had severed the joint tenancy and had conveyed his interest to Mary, whereupon Mary and Helene became tenants in common; that Mary's claim against Albert's estate for the $127,500 half interest would best be disposed of in the probate court; that Mary's request for repayment from Helene of all sums Helene recovered or may yet recover from Albert's estate was unfounded in law; and that equity required that Mary be awarded clear title to the real estate upon her payment to Helene of an amount equal to the fair value of Helene's interest in the property. Judgment was thereupon entered in favor of Helene in the sum of $107,988.25; upon satisfaction of judgment Helene was ordered to quitclaim her interest to Mary; and the administrator was dismissed from the case. Helene subsequently amended her complaint to include a count for partition.

This appeal followed.

OPINION

I

■ The first issue raised by Mary on appeal concerns the sufficiency of the evidence to overcome the presumption of validity that attaches to a duly acknowledged deed. (*Stone v. Stone* (1950), 407 Ill. 66, 94 N.E.2d 855.) Specifically, Mary argues that Helene has failed to meet her burden to present the "clear, convincing and satisfactory [evidence], and by disinterested witnesses" necessary to prove a recorded, duly acknowledged deed to be a forgery. (*Witt v. Panek* (1951), 408 Ill. 328, 333, 97 N.E.2d 283, 285.) While we agree with Mary's statement of the law in Illinois, we do not agree with her conclusions regarding Helene's evidence.

It is true that the strongest testimony concerning the forgery came from Helene herself. However, Donald Doud, the examiner of questioned documents and handwriting expert, testified that he could not identify the signature as Helene's, and that in his judgment she had not signed the deed. Mary attempts to diminish the effect of

Doud's evidence by saying that the second statement, which was given in testimony but not in Doud's earlier written report to Mary, demonstrates a change of opinion. We do not agree. Our reading of his responses leads us to conclude that Doud merely said the same thing in two different ways.

In addition, Jerome Zurla, the administrator, presented evidence that he had talked to Helene in Florida by telephone during the time surrounding the sale; Albert told the real estate broker that Helene was too ill to come to Chicago; and Goldman, knowing the extent of her illness, was very surprised at Albert's representation that Helene would be coming to Chicago to sign the deed. Further, Zurla's recounting of his telephone call to Goldman casts grave doubt on Goldman's testimony that Helene had signed the deed while in bed. Albert's actions in signing the listing agreement and sale contract, as well as the fact that the check for the sale proceeds was directed to be made out solely to Albert, all demonstrate that Helene knew nothing of the sale. When all the evidence pertaining to the forged signature is examined, it is clear to us that Helene has met her burden of proof and that the trial court properly held that Helene's signature on the deed was a forgery.

## II

In her second claim of error, Mary contends that because Albert breached his contract and conveyed only a one-half interest in the real estate while receiving the total purchase price, the trial court should have imposed a constructive trust for her benefit on one-half of the sale proceeds she paid to Albert. We agree.

■■ ■ "A constructive trust is a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs." (*Gravitt v. Jennings* (1979), 79 Ill. App. 3d 286, 288, 398 N.E.2d 395, 397.) An implied or constructive trust " 'arises by operation of law when the circumstances of a transaction are such that the court finds it inequitable for the legal owner to enjoy the beneficial interest.' " (*Price v. State of Illinois* (1979), 79 Ill. App. 3d 143, 148, 398 N.E.2d 365, 370.) A constructive trust will be imposed to prevent a person holding title to property to profit from his wrong or be unjustly enriched by retaining the property. *Bozeman v. Sheriff* (1976), 42 Ill. App. 3d 228, 355 N.E.2d 624.

■ A constructive trust will arise when there is a breach of a fiduciary relationship or when fraud is proved. (*Williams v. Teachers Insurance & Annuity Association* (1973), 15 Ill. App. 3d 542, 304 N.E.2d 656.) However, a court of equity will raise a constructive trust

even where there is no fraud whenever the circumstances of the transaction are such that a person who takes the legal estate may not enjoy the beneficial interest therein, as against the other party to the transaction. *Selmaville Community Consolidated School District No. 10 v. Salem Elementary School District No. 111* (1981), 96 Ill. App. 3d 1062, 421 N.E.2d 1087.

Helene argues that a constructive trust may not be imposed on either the $75,000 widow's award or on the $21,000 she received from Albert as maintenance between the date of the sale and Albert's death because she and Mary had no fiduciary relationship and Helene was not the perpetrator of the fraud. Accordingly, maintains Helene, the precedent cases cited by Mary are inapposite to the present case.

Helene misperceives the nature and effect of a constructive trust as applied to her situation, as did the trial court. "The purpose of a constructive trust, in addition to preventing unjust enrichment [citation], is to make available against the involuntary trustee all the conventional remedies available against a conventional fiduciary for breach of duty." *David v. Russo* (1983), 119 Ill. App. 3d 290, 297, 456 N.E.2d 342, 347.

■■ ■ In the instant case, as Helene herself has successfully argued, the fraud has been established as a fact. However, it is not Helene but Albert (now his estate) who is the constructive trustee holding property that belongs to Mary. Recognizing this fact from the outset, Mary joined the administrator of Albert's estate as a party defendant. Mary's request that the total of $96,000 given to Helene by Albert or the administrator be impressed with a constructive trust is based on the well-established principle that "[t]he trust *res*, if capable of identification, may be followed by the beneficiary into any and all the forms it may assume." (Emphasis added.) (*In re Estate of Joseph* (1961), 30 Ill. App. 2d 492, 495, 175 N.E.2d 265, 266, citing *Winger v. Chicago City Bank & Trust Co.* (1946), 394 Ill. 94, 67 N.E.2d 265, and others.) When a person's property has been wrongfully appropriated and converted into a different form, "equity impresses a constructive trust upon the new form or species of property, not only while it is in the hands of the original wrong-doer, but as long as it can be followed and identified in whosesoever hands it may come, except those of a *bona fide* purchaser for value." (4 J. Pomeroy, Equity Jurisprudence (sec. 1051, at 113 (5th ed. 1941).) "[P]roperty obtained by one [Helene] through the fraudulent practices of a third person [Albert] will be held under a constructive trust for the person defrauded [Mary] although the person receiving the benefit is innocent of collusion. If such person accepts the property, he adopts the means

by which it was procured ***." *Brennan v. Persselli* (1933), 353 Ill. 630, 636, 187 N.E. 820, 822.

The testimony of Kenneth Jacobson, attorney for the Monharts, established that after the closing, he and Albert, who was carrying the check for $215,976.59, walked to the Merchandise National Bank, where Jacobson observed Albert purchase a $200,000 certificate of deposit with the majority of the sale proceeds and deposit the remainder in his checking account. Bank officials testified to the successive rollovers of the fund into smaller certificates and the deposit of each balance in Albert's checking account. The last certificate, which the administrator was directed by the court to cash in order to provide Helene with her widow's award, was established to be in a direct chain from the first deposit and thus an identifiable *res* of the constructive trust.

█ Helene argues that no constructive trust may be imposed on her widow's award of maintenance payments, traceable or not, because the fraud was made possible by Mary's negligence in not demanding that the $215,976.59 check be made payable to both Helene and Albert; the necessity for Helene's endorsement would have alerted her to Albert's action in selling the property. As a result, Helene contends, Mary, whose action made the loss possible, must bear the loss as between two innocent parties. (*National Premium Budget Plan Corp. v. La Salle Casualty Co.* (1967), 81 Ill. App. 2d 466, 225 N.E.2d 400.) However, when all the conditions necessary to the imposition of a constructive trust are present, *i.e.*, when one person has obtained legal title to property that he ought not in equity and good conscience retain, neither the good faith of the recipient nor the negligence of the payor preclude recovery. (*Selmaville Community Consolidated School District No. 10 v. Salem Elementary School District No. 111* (1981), 96 Ill. App. 3d 1062, 421 N.E.2d 1087; *Board of Education v. Holt* (1976), 41 Ill. App. 3d 625, 354 N.E.2d 534.) We find, therefore, that the trial court erred in refusing to impose a constructive trust on Mary's behalf on the $75,000 received by Helene as a widow's award.

As to the $21,000 Helene received as maintenance, we find that Mary has not proved sufficiently that this money should be impressed with the trust. The monthly amounts were paid from Albert's checking account, into which the balance of the *res* was deposited after each certificate rollover. Helene argues that because money from other sources also was deposited into that account, there was insufficient proof that the money she received monthly came from the trust *res* itself. We agree.

■ "If the trust property is money and it has become commingled with private funds of like character, the [beneficiary] *** may recover an equivalent amount from the mixed fund if he can show the particular fund into which the money has gone, such as, for example, an individual bank account of the trustee." (35 Ill. L. & Prac. *Trusts* sec. 227, at 398 (1958).) However, where the trustee commingles trust funds with his own and subsequently withdraws sums from the combined fund for his own use, the conclusive presumption is that the trustee withdrew his own funds first. (4 J. Pomeroy, Equity Jurisprudence sec. 1058d, at 151 (5th ed. 1941); *People v. Barrett* (1950), 405 Ill. 188, 90 N.E.2d 94.) The burden is on Mary, therefore, to establish that the $3,500 payment each month actually depleted the trust *res* and was not paid out of Albert's other deposited funds. As we do not find such evidence in the record, we cannot find that Mary has sufficiently traced the $21,000 in maintenance payments to warrant impressing them with a constructive trust in her favor.

### III

Mary's third claim on appeal is that the trial court erred in discharging the administrator at the conclusion of the trial and refusing to decide her claim against Albert's estate. We agree.

■ Although the first suit filed by either of these parties was a breach of contract claim against Albert's estate brought by Mary in the probate court, after Helene filed her claim to quiet title, Mary joined the administrator as a party defendant in order that all issues in the case be decided in one proceeding. The trial judge heard all the evidence necessary to establish Mary's claim for reimbursement from Albert's estate and made specific findings of fact on those elements—the existence of a valid contract between Mary and Albert, her payment of the entire purchase price, and Albert's failure to fulfill his obligation under the sales contract to convey full title to the condominium unit. No other inquiry was necessary to support the claim, for the issue of the constructive trust and the tracing of the funds had no bearing on the breach of contract claim. Therefore, in the interest of judicial economy, the trial court should have decided the claim against Albert's estate.

■ ■ "It is axiomatic that where equity has assumed and has jurisdiction for the purpose of granting equitable relief the court may determine all the issues of the case, whether legal or equitable." (*McLeod v. Lambdin* (1961), 22 Ill. 2d 232, 236, 174 N.E.2d 869, 872.) A court acting in equity should enter a decree adjudicating all matters in controversy so as to avoid multiple litigation and to do full and

complete justice. *Midway Tobacco Co. v. Mahin* (1976), 42 Ill. App. 3d 797, 356 N.E.2d 909.

Further, Supreme Court Rule 366(a)(5) (73 Ill. 2d R. 366(a)(5)) affirms the power of the reviewing court to render any judgment and make any order that the case may require. Consequently, this court finds that, based on the record presented, Mary has proved her claim against Albert's estate in the amount of $113,163.30, which represents the consideration for the unconveyed one-half interest in the condominium unit, or one-half the earnest money ($5,175) plus one-half the net balance due at closing ($106,988.30).

Having decided that the trial court erred in refusing to impose a constructive trust on that amount and to trace the trust *res*, we further find that the $75,000 traceable to Helene in her widow's award should be impressed with a constructive trust. The balance payable to Mary from Albert's estate for the one-half interest he failed to convey is $38,163.30, and we enter judgment in that amount against Albert's estate. Upon Mary's receipt of that amount and her payment of it to Helene, Helene shall execute a quit-claim deed conveying her interest in the condominium unit to Mary. Helene, of course, is not barred from filing a claim against Albert's estate for the $75,000 widow's award now credited to Mary.

In light of our disposition of Mary's third claim of error, we need not decide whether the trial court erred in entering judgment against one who had breached no duty nor was in privity with the prevailing party.

Judgment reversed, cause remanded for such further action as required to implement this court's decision.

Reversed and remanded.

JIGANTI and ROMITI, JJ., concur.