807 F.2d 594
 Bankr. L. Rep. P 71,552
In re COLONIAL DISCOUNT CORPORATION, Debtor.
James C. COURTNEY, Trustee, Plaintiff-Appellee and Cross-Appellant,
v.
OCTOPI, INC. and Joe McNeal, Defendants-Appellants and
Cross-Appellees.
 Nos. 85-2298, 85-2308.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 18, 1986.
Decided Dec. 5, 1986.
 
 1
 Sidney Mishkin, Mishkin, Cromer, Eaglesfield & Maher, Indianapolis, Ind., for debtor.
 
 
 2
 Jon B. Abels, Dann, Pecar, Newman, Talesnick & Kleiman, Indianapolis, Ind., trustee.
 
 
 3
 Before COFFEY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*
 
 
 4
 WILL, Senior District Judge.
 
 
 5
 Colonial Discount Corporation ("CDC"), the debtor in this bankruptcy action, filed for reorganization under chapter eleven of the Bankruptcy Code. In the bankruptcy court, the trustee argued that certain transactions between CDC and appellants/cross-appellees Joe McNeal and Octopi, Inc. constituted avoidable preferences under 11 U.S.C. Sec. 547 (1982 & Supp. II). On the trustee's motion for summary judgment, the bankruptcy court ruled that some of the transactions were preferential and that others were not. The district court affirmed. On appeal, both sides challenge the lower court's conclusions. We affirm in part and reverse in part.
 
 I.
 
 6
 Prior to filing its chapter eleven petition, CDC was engaged in the business of buying and selling real estate. On October 23, 1981, CDC borrowed $150,000 from a lender known as Silvertown, Inc. In return, CDC gave Silvertown a promissory note and a mortgage on property located at 40-42 Virginia Avenue ("Virginia Avenue property"). The mortgage was never recorded. In exchange for Joe McNeal's agreement to act as surety on the loan, Silvertown assigned the promissory note and mortgage to him.
 
 
 7
 On November 13, 1981, CDC made a payment of $50,000 on the loan to McNeal, who in turn forwarded it to Silvertown. At this time, the due date of the note was extended from November 15, 1981 to December 7, 1981. When December 7 arrived, CDC failed to make payment and McNeal as surety paid Silvertown the balance of $102,560.
 
 
 8
 On January 13, 1982, McNeal incorporated Octopi, Inc. with himself as its president and sole shareholder. The same day, CDC executed a new note ("Octopi note"), evidencing its agreement to pay Octopi $110,000. In his affidavit and deposition, McNeal stated that the $110,000 figure represented the unpaid principal and interest on the original loan plus an additional cash advancement of "approximately $7,000" from McNeal to CDC. The trustee in his affidavit stated that the books and records of CDC contained no documentation of any cash advancement.
 
 
 9
 To secure the Octopi note, CDC granted mortgages to Octopi on the Virginia Avenue property and on real estate known as the Westman Glen Apartments in Hamilton County, Indiana ("Octopi mortgage"). Both mortgages were recorded on January 14, 1982.
 
 
 10
 CDC filed for bankruptcy on February 4, 1982. Its estate consisted of hundreds of separate real estate parcels, including the properties subject to the Octopi mortgage. After an auction at which the highest bid was rejected, the trustee abandoned the Westman Glen Apartments property to the senior mortgage holder, who then proceeded to foreclose on the property. On April 7, 1983, McNeal approached the trustee about obtaining a quitclaim deed for the apartments property. The trustee agreed to quitclaim his interest in the apartments property in exchange for $10,000 cash and a $25,000 credit on CDC's debt under the Octopi note and the mortgage on the Virginia Avenue property.
 
 
 11
 In September, 1983, McNeal offered to purchase the Virginia Avenue property from the trustee. Upon investigating the mortgages on the property, the trustee learned for the first time of the original loan from Silvertown to CDC and the subsequent transactions by which Octopi was substituted as obligee. The trustee promptly advised McNeal of his position that the Octopi mortgage on the Virginia Avenue property and the November 13, 1981 payment of $50,000 to McNeal on the original debt were preferential transfers. Subsequently, the trustee commenced this action.
 
 
 12
 In the bankruptcy court, the trustee moved for summary judgment, arguing that on the uncontradicted record the Octopi mortgage on the Virginia Avenue property and the $50,000 payment must be set aside as preferences. The bankruptcy court agreed with the trustee as to the Virginia Avenue mortgage, but disagreed as to the $50,000 payment. On appeal to the district court, the bankruptcy court's conclusions were affirmed.[1]
 
 II.
 
 13
 Rule 56 of the Federal Rules of Civil Procedure, which applies in bankruptcy proceedings by virtue of Rule 7056 of the Bankruptcy Rules, provides that summary judgment will be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.Pro. 56(c). On appeal, we apply the same standard, for the existence of a genuine issue of material fact is a legal determination subject to de novo review. See, e.g., In re Brass Kettle Restaurant, 790 F.2d 574 (7th Cir.1986).
 
 
 14
 The courts below found that there was no genuine issue as to each of the following material facts: (1) that CDC was insolvent when it granted the Octopi mortgage; (2) that McNeal gave no new consideration for the Octopi mortgage; (3) that the trustee was not estopped from asserting the invalidity of the Octopi mortgage; and (4) that the original $150,000 loan and $50,000 payment on the loan were made in the ordinary course of business of CDC and McNeal. After briefly discussing the relevant provisions of the Bankruptcy Code, we consider each of these issues in turn.
 
 
 15
 Section 547 of the Code sets forth the rules governing avoidability of preferential transfers. Under subsection (b), the trustee may avoid any transfer of property of the debtor that is:
 
 
 16
 (1) to or for the benefit of a creditor;
 
 
 17
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 
 
 18
 (3) made while the debtor was insolvent;
 
 
 19
 (4) made--
 
 
 20
 (A) on or within 90 days before the date of the filing of the petition; or
 
 
 21
 (B) between ninety days and one year before the date of the filing of the petition if such creditor at the time of such transfer was an insider;
 
 
 22
 (5) that enable such creditor to receive more than such creditor would receive if--
 
 
 23
 (A) the case were a case under chapter 7 of this title;
 
 
 24
 (B) the transfer had not been made; and
 
 
 25
 (C) such creditor received payment of such debt to the extent provided by the provisions of this title.
 
 
 26
 11 U.S.C. Sec. 547(b). Subsection (c), in turn, "excludes certain specified transfers from the trustee's preference avoiding power even though they literally fall within the definition of a preference contained in section 547(b)." 4 Collier on Bankruptcy p 547.37 (15th ed. 1979). Under subsection (g), added to the Code by the amendments of July 10, 1984, Pub.L. 98-353, Title III, Sec. 462(g), 98 Stat. 355, the trustee has the burden of proving avoidability under subsection (b), while the creditor has the burden of proving an exception to avoidability under subsection (c). 11 U.S.C. Sec. 547(g). Subsection (f) creates a presumption that the debtor was insolvent during the ninety days immediately preceding the filing of the petition. 11 U.S.C. Sec. 547(f).
 
 A.
 
 27
 McNeal and Octopi contend that a genuine issue of material fact exists as to whether CDC was insolvent under section 547(b)(3) on the date of the Octopi mortgage. Recognizing that CDC granted the mortgage well within the ninety day period in which, under subsection (f), they are presumed to be insolvent, the appellants maintain that they brought forth evidence sufficient to rebut the presumption. Specifically, they rely on CDC's financial report for the year ending September, 1980 and the two sets of balance sheets contained therein. The first set of balance sheets, which was prepared in accordance with generally accepted accounting principles, showed a positive net worth of $7,387. The second set used an experimental method of measuring "current value" and revealed a positive net worth of over five million dollars.
 
 
 28
 The evidence contained in the financial report is not sufficient to rebut the presumption of insolvency contained in section 547(f). First, although notes regarding litigation pending against CDC were appended to the report as late as September 1981, the report does not purport to reflect CDC's financial condition as of any date later than September, 1980.[2] The relevant period is in January, 1982, over a year later, when CDC made the Octopi mortgage. The fact that CDC's assets exceeded its liabilities by a mere $7,387 in September, 1980 does not tend to rebut the presumption that CDC was insolvent over a year later; if anything, it tends to support the presumption.
 
 
 29
 Second, the current-value balance sheets raise no genuine issue as to CDC's insolvency. As the independent auditors who examined the financial report noted, the current-value balance sheets "differ significantly from, and are not in accordance with, generally accepted accounting principles." Financial Report, Exh. 1 to McNeal's Affidavit, at 2. The auditors further observed:
 
 
 30
 Because current-value accounting is presently in an experimental stage, uniform criteria for the preparation and presentation of current-value financial information has not yet been established and acceptable alternatives exist as to the nature and content; accordingly, as experimentation proceeds, the principles followed in the accompanying current-value financial statements may be modified.
 
 
 31
 Given these caveats, and the additional fact that again the current-value balance sheets reflect CDC's financial condition only as of September 1980, we think it clear that this evidence would not have been admissible at trial and is therefore not properly considered on a motion for summary judgment. See Fed.R.Civ.Pro. 56(e) (supporting materials "shall set forth such facts as would be admissible in evidence"). In any event, the current-value balance sheets raise no "genuine" issue, since no reasonable factfinder could rest a verdict in favor of McNeal and Octopi on them. See Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
 
 
 32
 McNeal testified at his deposition that he relied on the financial report when he agreed to act as surety on the original loan. Any reliance by McNeal is simply irrelevant. Section 547(b)(3) is concerned solely with an objective question: whether the debtor's liabilities exceeded its assets on the date of the transfer sought to be avoided. 11 U.S.C. Sec. 101(29)(A) (defining insolvency); see Barash v. Public Finance Corp., 658 F.2d 504, 510 (7th Cir.1981) (legislative history of Sec. 547 supports view that preferential nature of transaction is determined by objective criteria).
 
 
 33
 Finally, the trustee produced evidence of CDC's insolvency. In his affidavit, the trustee stated, based on his personal knowledge of CDC's books and records, that:
 
 
 34
 The Debtor's financial condition did not significantly deteriorate between October 1, 1981 and the filing of the chapter 11 petition on February 4, 1982. The Debtor was insolvent on October 1, 1981 and at all times thereafter.
 
 
 35
 Often it is necessary to infer the fact of insolvency from other facts. In re Claxton, 32 B.R. 215, 218 (Bankr.E.D.Va.1983). "When the date is near and no change in circumstances is shown, the Court may infer insolvency as of the relevant date." Id. (citing In re Great Western Biscuit Co., 85 F.Supp. 314, 315 (S.D.Cal.1949)). Indeed, on the undisputed record in this case, the lower courts drew the only permissible inference: that CDC was insolvent on October 1, 1981 and thereafter.
 
 
 36
 In sum, the lower courts correctly held that CDC was insolvent when the Octopi mortgage was made in January, 1982. As such, the trustee met his burden of proving the elements of section 547(b)(3).
 
 B.
 
 37
 McNeal and Octopi next contend that the lower courts erred in concluding that McNeal had not made a cash advancement of approximately $7,000 to Octopi in connection with the Octopi note and mortgage. The appellants' theory is that the $7,000 payment brought them within the exception to avoidance set forth in 11 U.S.C. Sec. 547(c)(1). This section provides that the trustee may not avoid a transfer:
 
 
 38
 to the extent that such transfer was (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange.
 
 
 39
 11 U.S.C. Sec. 547(c)(1).
 
 
 40
 The bankruptcy court simply ignored McNeal's testimony that part of the consideration for CDC's promise to pay $110,000 to Octopi was a contemporaneous exchange of approximately $7,000 in cash. The district court, while acknowledging the testimony, discounted it because McNeal never provided documentary evidence to substantiate it, even though he stated at his deposition that he could do so. In opposition to McNeal's testimony, the district court noted, the trustee observed that nothing in the books and records of CDC indicated that the cash had been received.
 
 
 41
 We agree with the appellants that the district court should not have resolved this dispute on motion for summary judgment. There is no burden on a party opposing summary judgment to supply documentary evidence in support of oral testimony that raises an issue of fact. Moreover, summary judgment is rarely an appropriate method of resolving credibility questions. Stewart v. RCA Corp., 790 F.2d 624, 628 (7th Cir.1986). In light of the fact that $7,000 is approximately the difference between the amount McNeal paid Silvertown on behalf of CDC ($102,560) and the $110,000 amount of the Octopi note, McNeal's testimony is not implausible on its face. Of course, there are alternative theories, such as interest, to explain the difference; the point is simply that McNeal's testimony raises a factual question on which differing conclusions could be drawn.
 
 
 42
 At the same time, nothing in McNeal's testimony contradicts the evidence that the remainder of the $110,000 amount was given in exchange for an "antecedent debt," 11 U.S.C. Sec. 547(b)(1)--i.e., McNeal's $102,560 payment to Silvertown--and was not "new value." 11 U.S.C. Sec. 547(a)(2) (new value "does not include an obligation substituted for an existing obligation"). Since section 547(c)(1) specifically exempts a contemporaneous exchange only "to the extent that" it is for new value, the court on remand should reconsider the avoidability of the Octopi debts only to the extent of the alleged cash advancement.
 
 C.
 
 43
 McNeal and Octopi argue that the trustee was estopped from denying the validity of the Octopi mortgage. In their view, when the trustee granted McNeal a quitclaim deed on the apartments property in exchange for a $25,000 credit on the debt secured by the Virginia Avenue property, the trustee implicitly recognized the validity of the Octopi mortgage.
 
 
 44
 We disagree. "Estoppel arises when one party's conduct leads another to believe that a right will not be enforced and causes the one so misled to act to his detriment in reliance upon his beliefs." Walaschek & Associates v. Crow, 733 F.2d 51, 54 (7th Cir.1984). Nothing in the trustee's conduct could have led McNeal reasonably to believe that the trustee was acknowledging the validity of the mortgage on the Virginia Avenue property. At most, the trustee acknowledged the underlying debt owing from CDC to Octopi.
 
 
 45
 As the trustee stated in his affidavit, until McNeal approached him in September 1983 about purchasing the Virginia Avenue property, he had no occasion to investigate the validity of the mortgage on the property. As soon as he learned of the circumstances surrounding the Octopi mortgage, he notified McNeal of his position that the mortgage was avoidable in bankruptcy. If McNeal was seeking assurances prior to that time, such as in April 1983 when the negotiations for the $25,000 credit took place, he could have requested the trustee to investigate. McNeal never made any such request. In these circumstances, he had no reasonable basis for relying on the April 7, 1983 transaction as grounds for estoppel.
 
 D.
 
 46
 On cross-appeal, the trustee challenges the lower courts' finding that the $150,000 loan and $50,000 payment pursuant thereto were made in the ordinary course of business of CDC and McNeal. This finding led to the conclusion that the appellants had qualified for the exception to avoidance in 11 U.S.C. Sec. 547(c)(2). Section Sec. 547(c)(2) provides that the trustee may not avoid transfers that are (1) in payment of a debt incurred in the ordinary course of business of both the debtor and the transferee; (2) made in the ordinary course of business of both the debtor and the transferee; and (3) made according to ordinary business terms.
 
 
 47
 In his brief, the trustee writes that "loans made on the eve of bankruptcy to relieve a debtor's cash flow problems can never be considered as being 'ordinary' for purposes of 11 U.S.C. Sec. 547(c)(2)." We think this characterization of the loan puts too much emphasis on its timing. While it is true that CDC was insolvent at the time of the loan and its partial repayment, insolvency is but one of the requirements of section 547(b). Moreover, even when all the requirements of subsection (b) are satisfied, a creditor may still establish an exception to avoidance by making a proper showing under subsection (c). See 4 Collier on Bankruptcy p 547.37 (15th ed. 1979).
 
 
 48
 The purpose of the ordinary course of business exception is to ensure that normal commercial transactions are not caught in the net of the trustee's avoidance powers. See Barash v. Public Finance Corp., 658 F.2d 504, 510 (7th Cir.1981). The obvious extra-"ordinary" transaction is one designed to give the transferee an advantage over other creditors in bankruptcy. Nothing in the record suggests that the Silvertown loan transaction was related in any way to pre-bankruptcy planning. The loan was originally made some 104 days prior to the bankruptcy filing date and the payment in question some 79 days prior thereto. Nor does it indicate any "unusual action by either the debtor or creditor" to collect or pay on the deal. Barash, 658 F.2d at 510, quoting H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 373-74 (1977), reprinted in U.S.Code Cong. & Ad.News 5787, 6329 (1978); S.Rep. No. 95-989, 95th Cong., 2d Sess. 88 (1978), reprinted in U.S.Code Cong. & Ad.News 5874 (1978).
 
 
 49
 On the contrary, the record shows that for twenty years CDC was in the business of buying and selling real estate, and that its business regularly involved borrowing large sums of money. McNeal had previously done business with several people at CDC, including Jack Griffith, CDC's sole shareholder. The note was initially assigned a short due date and the partial repayment on the note was made shortly before it became due and in consideration of an extension of the due date, all normal business arrangements. In sum, the record supports the conclusion of the courts below that the October 23, 1981 note, as well as the due date extension to December 7, 1981 and the $50,000 payment on November 13, 1981, two days prior to the note's original November 15, 1981 maturity, in consideration of that extension, were all in the ordinary course of business of both the debtor and the transferee and were in ordinary business terms. Accordingly, the appellants met their burden of establishing an exception to avoidance under section 547(c)(2).
 
 III.
 
 50
 For the reasons stated above, the decision of the district court is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Though in its judgment order the bankruptcy court stated simply that it was granting summary judgment for the trustee on the question of whether the Octopi mortgage was preferential, its opinion clearly holds that, as to the $50,000 payment, McNeal and Octopi had "sustained [their] burden of establishing an exception to avoidance." All parties and the district court treated the bankruptcy court's decision as a final decision granting summary judgment in part for the trustee and in part for McNeal. Because we find this treatment to be appropriate in light of the record, our own jurisdiction is established
 
 
 [2]
 In the introduction section of the financial report, the independent auditors who examined it stated:
 As discussed in Note 23 of the Notes to Financial Statements, the Indiana Securities Commission filed a lawsuit against the Company on September 14, 1981. The lawsuit relates to the sale of investment notes by the Company and alleges that the notes are not adequately secured. The ultimate outcome of this litigation cannot be determined, and no provision has been made in the 1980 financial statements for any loss that may result.
 * * *
 In our opinion, subject to the effects on the 1980 financial statements of the outcome of the uncertainty referred to in the second and third paragraphs, the consolidated financial statements referred to above presented on a historical cost basis present fairly the financial position of Colonial Discount Corporation and subsidiaries as of September 30, 1980 and 1979....
 Financial Report, Exh. 1 to McNeal's Affidavit, at 1, 2.