In the Matter of DIAMOND MORTGAGE CORPORATION OF ILLINOIS and A.J. Obie & Associates, Inc., Debtors.

Wendell SINENI and Loretta Sineni, his wife, Plaintiffs and Counter Defendants,

and

the Official Committee of Matched Mortgage Holders, Plaintiff-Intervenor,

v.

DIAMOND MORTGAGE CORPORATION OF ILLINOIS, and A.J. Obie & Associates, Inc., Illinois corporations, Defendants and Counter-Plaintiffs,

and

the Official Unsecured Creditors' Committee of Diamond Mortgage Corp., Defendant-Intervenor-Counter-Plaintiff.

Bankruptcy Nos. 86 B 13066, 86 B 13067.

Adv. Nos. 86 A 1283, 86 A 1284.

United States Bankruptcy Court, N.D. Illinois, E.D.

Sept. 28, 1987.

Myron M. Cherry, Cherry & Flynn, Chicago, Ill., Carl G. Becker, Carl G. Becker & Associates, Southfield, Mich., David N. Missner, Mark L. Prager, Bruce Dopke, Schwartz, Cooper, Kolb & Gaynor, Chtd., Chicago, Ill., for debtor.

Warren Krinsky, P.C., Chicago, Ill., for plaintiffs and counter defendants.

Ronald R. Peterson, C. Steven Tomashefsky, Jenner & Block, Chicago, Ill., for Official Unsecured Creditors' Committee.

Kenneth H. Denberg, Robert J. Vollen, Thea M. Pazen, Schwartz & Freeman, Chicago, Ill., for Matched Mortg. Holders' Committee.

## MEMORANDUM AND OPINION

ROBERT E. GINSBERG, Bankruptcy Judge.

### JURISDICTION

This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F), (K), and (O).

### FACTS

A.J. Obie and Associates, Inc. ("Obie") is a licensed mortgage broker. Diamond

Mortgage Corporation of Illinois ("Diamond") made loans to consumer debtors secured by mortgages on the borrowers' homes. In order to provide funds for Diamond to lend, Diamond sold its mortgage notes to individual investors solicited by Obie through an active media advertising campaign. After the notes were sold, Diamond continued to service the mortgages for the purchaser.[1] Although Obie represented to its investors that they would receive a note from Diamond secured by a mortgage, many (probably a majority) of the Diamond investors were never actually matched with a mortgage or received a note. Regardless of whether an investor was actually matched with a mortgage, the investor received payments from Obie based on the amount of his or her investment. If an investor was matched with a mortgage, the investor would receive interest payments based on a rate determined by the mortgage itself. Investors who had not been matched with a mortgage were paid interest at some rate paid by Diamond as a return on their investments. How the latter rate was determined is less than clear.

On June 11, 1986, Wendell and Loretta Sineni (the "Sinenis") visited Obie's office to inquire about making an investment. After talking with Peter Grib, one of Obie's sales representatives, the Sinenis requested that they be provided with the actual mortgages or names of mortgagors before they made their investment. In response Grib told the Sinenis about three specific mortgages with an aggregate principal balance close to the $75,000 the Sinenis wanted to invest. Grib never actually showed the

Sinenis any of the actual notes or related mortgage documents. Instead, he left the room in which he was meeting with the Sinenis and returned with a piece of scratch paper with three names on it.[2] Diamond or its affiliate companies did have notes and mortgages for borrowers named Boston, Carter, and Levingston on the day Grib met with Sinenis.

Before leaving, the Sinenis paid $75,000 to Obie on the spot. The Sinenis received a receipt for their $75,000, entitled a "confirmation".[3] The Sinenis were told that their mortgage documentation, i.e., the three notes and three mortgage assignments as well as related documents, would be forwarded to them in a package, as soon as the mortgage assignments were filed with the Cook County Recorder of Deeds. Obie immediately deposited the Sinenis' check in its general account where it was commingled with other investors' funds.

After the June 11, 1986 meeting, Diamond made certain notations in its own files to indicate that the notes in question were to be sold to the Sinenis. First, sometime between June 11 and June 19, 1987 the words "sold-Sinenis" had been noted on the reverse side of picture cards respecting the properties securing the three notes the Sinenis had allegedly purchased.[4] Additionally, at some point in time a "Post-It" yellow stick-on attachment with the words "Sineni 6/19" written on it was affixed to the three picture cards. Finally, on July 29, 1986, Diamond sent the Sinenis amortization schedules for the three mortgages in question as well as the picture cards for the relevant properties.[5]

---

1. Among the services provided by Diamond for the investors were collecting monthly payments from the mortgagees, collecting and administering escrow accounts for the payment of property taxes and insurance, and the institution of collection procedures on behalf of the note purchasers should the mortgagee default.

2. The three notes were identified as the Boston, Carter and Levingston notes (which were the names of the borrowers). The Boston note named Commerce Mortgage Company as payee, while the other two notes named Diamond as payee. Commerce was another entity in the Diamond/Obie empire. *See* n. 13, *infra*. The

aggregate principal balance of the three notes was $74,297.75.

3. The confirmation referred to the Sinenis as "depositors".

4. Diamond kept "picture cards" as a means of inventorying each mortgage note that it owned. These picture cards were index cards with a photograph of the mortgaged premises stapled onto them.

5. Diamond's letter of transmittal indicated that the original mortgage documents were "in processing" and would be sent "[w]hen the entire 'package' is completed ...".

In July, 1986, the Sinenis received a check for an interest payment of $493.20.[6] Subsequently, by check dated August 1, 1986, the Sinenis' received a refund of $702.24, representing the difference between the Sinenis' investment and the aggregate principal balance of the three notes.

On August 1, 1986 Diamond executed formal assignments of the three mortgages corresponding to the three notes in question. On the same date Diamond also indorsed the three notes to the Sinenis.[7] The mortgage assignments were forwarded for recording to the Cook County Recorder of Deeds and were eventually recorded on August 13, 14 and 21, 1987. On August 25, 1986 Obie and Diamond (the "Debtors") filed separate petitions under Chapter 11 of the Bankruptcy Code. The Debtors' bankruptcy petitions were filed before either the notes or the recorded mortgage assignments were actually forwarded by Diamond to the Sinenis.

The Sinenis brought this action seeking to have the three notes and mortgages turned over to them as their property. The Debtors have taken the position that there was never a transfer of the notes and mortgages to the Sinenis, and that the notes continue to be property of the estate. The Debtor's fallback position is that even if the notes and mortgages were transfer-

red to the Sinenis prepetition such transfers are voidable under sections 544(a) & 547 of the Bankruptcy Code. 11 U.S.C. §§ 544(a) and 547. The Committee of Matched Investors (the "Matched Committee") has intervened in support of the Sinenis. The Unsecured Creditors Committee (the "Unsecured Committee") has intervened in support of the Debtors. The dispute has been fully tried and briefed and is now before the Court for a decision.

## DISCUSSION

The threshold question presented to the Court is whether, as a result of the transactions between the Debtors and the Sinenis, the Sinenis actually acquired the three notes and mortgages so that they were matched investors owning the notes and mortgages at the time of the petition or whether the three notes are property of the Debtors' estates. The question that follows is if the notes and mortgage were transferred to the Sinenis prepetition, whether there is any theory under which the Debtors can recover the notes and mortgages for the estate.

For purposes of analysis the transaction between the Debtors and the Sinenis should be viewed as a sale of promissory notes secured by mortgages on real property.[8] Title to a promissory note is transfer-

6. This interest payment was calculated on the full amount of the Sinenis' investment, $75,000, and not the aggregate principal balance of the three notes, $74,297.75, at an annual rate of 12%. Apparently the payment was the amount an unmatched investor would have received for an investment of $75,000 with Diamond/Obie for a similar period of time.

7. Each note was stamped with the notation "I hereby assign all right, title and interest to this document to Wendell Sineni and Loretta Sineni", and was signed by an authorized Diamond employee.

8. The Unsecured Committee has advanced the argument that the transaction was actually a loan by the Sinenis to the Debtors and not a sale. Assuming for the sake of argument that the transaction was a loan, *see generally, In Re The Woodson Co.,* 813 F.2d 266, 270–72 (9th Cir.1987), the result would be obvious. A security interest in a promissory note can only be perfected by the secured party taking actual

possession of the instrument. Ill.Rev.Stat., ch. 26, para. 9–304(1) (1986). The fact that the Sinenis never took actual possession of the three notes is undisputed. Thus, the Sinenis never obtained a perfected security interest in the three notes. An unperfected security interest is subordinate to the rights of a lien creditor. Ill.Rev.Stat., ch. 26, para. 9–301(1)(b) (1986). *See also In re Johnson,* 28 B.R. 292, 296 (Bankr. N.D.Ill.1983). A lien creditor includes a bankruptcy trustee (or debtor-in-possession). 11 U.S.C. §§ 544(a)(1), 1107. *See also* Ill.Rev.Stat., ch. 26, para. 9–301(3) (1986). Thus, if the transaction is viewed as a secured transaction, the three notes are recoverable for the benefit of the Debtors' estates. 11 U.S.C. § 550(a). Since the same result is obtained if the transaction is viewed as a sale, the Court arguably does not have to choose between the two theories. However, the Court does find that the intent of the parties was to enter into a sale transaction, not a secured transaction. *See generally In re The Woodson Co., supra.* The Court's ruling is premised on a sale approach.

red when the note is negotiated. Ill.Rev. Stat., ch. 26, para. 3–201, para. 3–202 (1986). A promissory note, payable to order, is negotiated by both indorsement and delivery. Ill.Rev.Stat., ch. 26, para. 3–202 (1986). Delivery is defined as "[T]ransfer of possession." Ill.Rev.Stat., ch. 26, para. 1–201(14) (1986). Illinois case law makes it clear that negotiation always requires delivery, *Locks v. North Towne National Bank of Rockford*, 115 Ill.App.3d 729, 71 Ill.Dec. 531, 451 N.E.2d 19 (1983), and that delivery is valid when the maker or holder of the note has parted with possession and control over the negotiable instrument. *Schranz v. I.L. Grossman, Inc.*, 90 Ill.App. 3d 507, 45 Ill.Dec. 654, 412 N.E.2d 1378 (1980).

Illinois case law also, however, provides support for the premise that physical delivery is not required and that constructive delivery may be adequate in certain instances where the circumstances clearly indicate that the intentions of the parties to have something other than actual physical delivery constitute delivery. Constructive delivery has been found to be adequate delivery when the maker of the note was also an agent of the payee and kept the note with the payee's papers even though the note was never actually delivered to the payee and the maker never actually parted with it. *Trustees of Danvers Literary & Library Assoc., et al. v. Skaggs*, 280 Ill. App. 125 (1935). Similarly, constructive delivery was upheld as adequate delivery when the maker actually delivered an assignment of a note to the payee and held the note both for its own benefit and the benefit of the payee. *Lewis v. Palmer*, 20

Ill.App.3d 237, 313 N.E.2d 656 (1974). These cases suggest that the constructive delivery approach is to be used when circumstances indicate no intent on the part of either party to have the note actually physically delivered to the assignee. These cases seem to suggest that possession by the assignor (or maker) can constitute delivery, if the facts indicate that both the assignor and assignee intend that the assignor retain possession for the benefit of the assignee in lieu of physical delivery.

The problem for the Sinenis is that no such intent appears here. It is clear that both the Sinenis and Obie specifically intended that the notes would be physically delivered to the Sinenis as soon as the necessary paperwork was completed. The only reason this didn't happen was bankruptcy intervened to stop the assignment process. In addition, the July interest payment, based on the amount of the investment and not the principal balance of the mortgages, evidenced the intent of the parties that no assignment of the notes would take place ahead of delivery. The letter transmitting the amortization schedules leads to the same conclusion. Therefore, this does not appear to be a case for constructive delivery.

However, assuming for the sake of argument only that there was in fact constructive delivery, negotiation of the three notes to the Sinenis could not have been completed prior to August 1, 1986.[9] It is clear that negotiation of these notes and mortgages requires *both* indorsement and delivery. Ill.Rev.Stat., ch. 26, para. 3–202 (1986).

**9.** The Matched Committee argues that assignment of at least an equitable interest in the notes in question to the Sinenis took place prior to August 1, 1986, whether or not negotiation ever took place. The Matched Committee claims that Diamond held legal title to the three notes in oral trust for the benefit of the Sinenis. This argument is without merit. There was no intent to create a trust relationship between the Sinenis and Diamond. Diamond intended to sell the notes, and the Sinenis intended to buy both legal and equitable title to the three notes. The fact that Diamond would continue to service the mortgages did not give rise to an actual trust relationship. There is no evidence of intent to separate legal and equitable ownership

in the notes and mortgages. In addition because there is no evidence of fraud or other inequitable conduct by Diamond in its dealings with the Sinenis, there is no reason to impose a constructive trust here. *Sadacca v. Monhart*, 128 Ill.App.3d 250, 83 Ill.Dec. 463, 470 N.E.2d 589, 593 (1984). The simple fact is that the Sinenis, despite their aggressive attitude in their dealings with Diamond, were willing to give Diamond/Obie $75,000 first and then wait for indorsement and delivery of "their" notes and mortgages. Now, in hindsight, they regret the consequences of that unwise decision and seek to restructure the entire transaction. It is too late.

*See also Lewis v. Palmer,* 20 Ill.App.3d 237, 313 N.E.2d 656, 659 (1974). Even if there was constructive delivery before August 1, 1986, there is no dispute that indorsement did not take place until August 1. None of the papers the Sinenis received before August 1 from Diamond could reasonably be construed to be an indorsement of the notes in question. Ill.Rev.Stat., ch. 26, para. 3–202 (1986).[10]

■ Transfer of the notes on August 1 does not help the Sinenis. The Debtor's bankruptcy petitions were filed on August 25, 1986. Assuming the three notes were negotiated on August 1, 1986, such transfer occurred within 90 days before the filing of the bankruptcy petitions.[11] If that is the case, as is explained below, the transfer of the notes (as well as the interest payment and refund) is avoidable under section 547, the preference provision of the Bankruptcy Code.[12]

Section 547(b) of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property

(1) to or for the benefit of the creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

(A) on or within 90 days before the date of the filing of the petition ... and

(5) that enables such creditor to receive more than such creditor would receive if

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by

---

**10.** The relevant date here is the date of the negotiation of the notes, not the date the mortgage assignments were recorded. What the Debtors were selling was the notes. Assignment of the mortgages without assignment of the notes would have been a legal nullity because only the holder of the claim against the mortgage debtor (i.e., the noteholder) can enforce the mortgage. *See Joslyn v. Joslyn,* 386 Ill. 387, 390 (1944). *See also Elvin v. Wuchetich,* 326 Ill. 285, 288 (1927).

**11.** Obviously, the July 1986 interest payment and the August 1, 1986 refund payment also occurred within the 90 day pre-petition period.

**12.** At trial, a great deal of attention and testimony was devoted to the issue of the applicability of section 541(d) of the Bankruptcy Code to these Debtors and their business. Section 541(d) states that

"Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d).

Section 541(d) is a straw issue in this dispute. It simply does not apply here, even if it should apply to businesses such as Diamond/Obie. It does not apply because there was never any separation of legal and equitable ownership in these notes and mortgages. Such a separation is a prerequisite to the applicability of section 541(d) of the Bankruptcy Code by its own terms. Until completion of the sale to the Sinenis, Diamond owned full legal and equitable title to the notes in question. If the sale had been completed, the Sinenis would have owned full legal and equitable title to the notes and all ownership interest of Diamond would have been terminated. The Sinenis never acquired equitable title to the notes in question. As previously indicated, that was not what the parties intended to accomplish. Therefore, this transaction stands in sharp contrast to the normal secondary mortgage market transaction. Section 541(d) is also inapplicable because, as discussed *infra,* if there was a negotiation of the three notes, such negotiation was a preference and section 541(d) will not operate to validate an otherwise preferential transfer. *In re Lemons & Associates, Inc.,* 67 B.R. 198, 215 (Bankr. D.Nev.1986) ("[N]othing in § 541(d) or its legislative history indicates that the trustee is precluded from attacking the assignment of an interest in a mortgage, or the creation of any trust generally, as preferential under § 547 ..."). *See also In re North American Coin & Currency, Ltd.,* 767 F.2d 1573, 1576 n. 2 (9th Cir.1985), *cert. denied,* 475 U.S. 1083, 106 S.Ct. 1462, 89 L.Ed.2d 719 (1986) (creation of a trust may be a preference subject to attack). Because the Court does not believe that section 541(d) has any application here, there is no need to address the arguments respecting the interaction of sections 541(d) and 544(a) of the Bankruptcy Code.

the provisions of this title. 11 U.S.C. § 547(b).

All of the elements of section 547(b) have been met. The assignment of the three mortgages together with the negotiation of the three notes was a transfer of property owned by Diamond.[13] The transfer was for the benefit of the Sinenis. The transfer was on account of an antecedent debt, the antecedent debt being the $75,000 deposited with the Debtors by the Sinenis on June 11, 1986. Until actual assignment of the notes in question was completed, the Sinenis were nothing more than unsecured creditors of Diamond, as evidenced by the large constituency represented by the Unsecured Committee. The parties stipulated at trial that the Debtors were insolvent on August 1, 1986. Assuming an August 1, 1986 transfer, the transfer was made within 90 days before the Debtors' bankruptcy petition filings. Finally, it was stipulated that the transfer, if effective, would enable the Sinenis to receive more than they would have received if the transfer had not been made and they had received payment of their debt in a hypothetical Chapter 7 case for Diamond/Obie as provided by the Bankruptcy Code. Accordingly, the transfer of the three notes was a preference under section 547(b) of the Bankruptcy Code, avoidable by the trustee.[14]

However the Sinenis and their allies have raised several defenses to a preference recovery. Specifically, the Matched Committee, on behalf of the Sinenis, has raised both the contemporaneous exchange for new value and the ordinary course of business defenses under sections 547(c)(1) and (2) of the Bankruptcy Code. By virtue of section § 547(g) of the Bankruptcy Code the Matched Committee has the burden of proof of establishing a § 547(c) defense. *See In re Alithochrome Corp.*, 53 B.R. 906, 909 (Bankr.S.D.N.Y.1985). The Matched Committee has failed to establish a section 547(c) defense to the Debtor's preference recovery action by a fair preponderance of the evidence.

Section 547(c)(1) of the Bankruptcy Code provides that a trustee may not avoid a transfer of property as a preference if the transfer was intended by both the debtor and the transferee to be a contemporaneous exchange for new value and was in fact made substantially contemporaneously.[15] The evidence is clear that the Sinenis intended the exchange to be contemporaneous. The evidence is not so clear with respect to the Debtors, but the Court believes the Debtors intended the transfers to be contemporaneous as well. Thus the question is whether the transfers were in fact substantially contemporaneous.

Section 547(e) of the Bankruptcy Code governs when a transfer is deemed to have occurred for preference purposes. The transfer of promissory notes is deemed to have occurred when no other creditor of the debtor could acquire an interest superior to the transferee by means of legal proceedings. 11 U.S.C. § 547(e)(1)(B). *See also In re Sider Ventures & Services Corp.*, 47 B.R. 406, 407 (S.D.N.Y.1985). As previously noted, the earliest the Sinenis acquisition of an interest in the three notes would have been perfected against a creditor of Diamond with a lien by legal proceedings, if at all, was on August 1, 1986. *See Lewis v. Palmer*, 20 Ill.App.3d 237, 313

---

**13.** The Matched Committee argues that the Boston note was not the Debtors' property because it was payable to Commerce Mortgage Company and therefore the Debtors had no ownership interest in this note. Evidence offered at trial, however, indicates that the money Commerce lent to Boston came from Diamond. Commerce gave Diamond no consideration for funding Commerce's loan to Diamond. The evidence makes it clear the Commerce was a mere conduit for Diamond. In fact Commerce was nothing more than an alter ego of Diamond with no real independent existence. Accordingly, Diamond did have a property interest in the Boston note.

**14.** The same analysis is applicable to the interest and refund checks received by the Sinenis such that they, too, are preferences.

**15.** "The [contemporaneous exchange] exception is a simple one, excepting a transfer that is really not on account of an antecedent debt …"). 4 Collier on Bankruptcy, ¶ 547.09 at 547–40 n. 2 (L. King 15th ed. 1987) (citing Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand.L.Rev. 713, 759–67 (1985)).

N.E.2d 656, 659 (1974). The Sinenis paid their $75,000 to the Debtors on June 11, 1986. The more than six week delay between June 11 and August 1 negates any argument that these exchanges were in fact substantially contemporaneous. The transaction was delayed in Diamond's offices. It was delayed to the point that Mrs. Sineni made several calls to Diamond to complain of the delay, suggesting she no longer thought it to be substantially contemporaneous. The record makes it clear that this delay took the transaction out of the substantially contemporaneous category both as a matter of fact and a matter of law. *In re Downs,* 65 B.R. 1, 3 (Bankr.E.D.Tenn.1985) (58 day delay); *In re Independence Land Title Corp.* 9 B.R. 394, 396 (Bankr.N.D.Ill.1981) (49 day delay).[16]

Section 547(c)(2) of the Bankruptcy Code provides that transfers in the ordinary course of business may not be avoidable. There are three elements which must be met under the section to render the transaction non-avoidable. First, the transfer must be in payment of a debt incurred by the debtor in the ordinary course of the business or financial affairs of both the debtor and the transferee. 11 U.S.C. § 547(c)(2)(A). Second, the transfer must be actually made in the ordinary course of business or financial affairs of both the debtor and the transferee. 11 U.S.C. § 547(c)(2)(B). Finally, the transfer must be made according to ordinary business terms. 11 U.S.C. § 547(c)(2)(C). *In re Colonial Discount Corp.,* 807 F.2d 594, 600 (7th Cir.1986); *Windsor Communications v. Freedom Greeting Card,* 63 B.R. 770, 773–75 (E.D.Pa.1986); *In re AOV Industries,* 64 B.R. 933, 943 (Bankr.D.C.1986). *See also Barash v. Public Finance Corp.,* 658 F.2d 504, 509 (7th Cir.1981).

The Matched Committee has not met its burden as to any of the elements of section 547(c)(2). This is true regardless of whether an objective, industry wide test of ordinary course is used or a subjective approach focusing on these Debtors' business practices it used. Neither the Committee nor the Sinenis have shown that their investment in Diamond/Obie was the type of normal commercial transaction which should not get caught up in the trustee's avoiding powers. *See, e.g., In re Colonial Discount Corp.,* 807 F.2d 594 (7th Cir. 1986); *Barash v. Public Finance Corp.* 658 F.2d 504 (7th Cir.1981). In fact, after reviewing the evidence, this Court is led to conclude that little, if anything, was normal about the Sinenis investment with the Debtors.

The evidence offered at trial showed in essence that the Debtors had no ordinary course of business. That evidence showed that at best the matching of investors and notes in the Diamond/Obie business was a matter of serendipity. It certainly was not in the ordinary course of Diamond's business to have an investor come in and try to get notes and mortgages assigned at the outset of the investment and to have notes assigned to that investor some six or seven weeks later. Testimony of Diamond employees indicated that only a small percentage of investors acted like the Sinenis. Most investors simply gave Diamond/Obie their money. Many investors never were matched with mortgages.[17] The Sinenis and the Matched Committee have not shown by a fair preponderance of the evidence this transaction to have fit within the ordinary course of Diamond/Obie's business either in the way they "deposited" their $75,000 or in the steps that were taken to assign the Boston, Carter, and Levingston notes and mortgages to them.

Of equal importance, it was not shown that it was the ordinary course of the Sinenis' financial affairs to advance $75,000 and then to collect on that debt. Indeed,

---

16. The interest and refund checks were endorsed and delivered on July 15 and August 1, 1986, respectively. These payments also were obviously not contemporaneous exchanges. Instead, the interest check at least, indicates a credit transaction.

17. Thus, there is an indication of unusual actions by both the Sinenis to get matched to mortgages and the Debtors to match them to mortgages. The fact is that the Sinenis acted differently from the vast majority of people who invested with Diamond/Obie. *Compare In re Colonial Discount Corporation,* 807 F.2d 594, 600 (7th Cir.1986).

 

their financial circumstances would suggest that such a large investment would be most unusual in their lives. Their previous investment history was marked by conservative investments. This investment appeared to be their sole venture into the high risk mortgage note market. In any case, it was their burden (or the Matched Committee's) to offer evidence of similar investments, and that they failed to do.

Finally, there is no evidence that the Sinenis and the Debtors dealt in accordance with ordinary business terms. Indeed the testimony is to the contrary, i.e., to the effect that at least institutional investors in the secondary mortgage market would not advance money without a simultaneous execution of the documents required for an assignment of the notes and mortgages. In addition the Debtors' haphazard matching of investors to mortgages at any given time after the investment was made (if ever) made unlikely that any investor could have dealt with Diamond/Obie "according to ordinary business terms". However, it was not the Debtors' burden to show that transfers were not in accordance with ordinary business terms. It was the burden of the Sinenis and the Matched Committee to show it was. They have not sustained the burden. Accordingly the 547(c)(2) defense fails as well. The Sinenis and the Matched Committee had the burden of showing that each of the three tests was satisfied. *In re Colonial Discount Corporation*, 807 F.2d 594, 597 (7th Cir.1986). They have failed to prove that any of the three tests can be met in this case.[18]

IT IS HEREBY ORDERED AND ADJUDGED that the Sinenis' complaint is denied and dismissed.

IT IS FURTHER ORDERED that judgment is entered in favor of the Debtors on the Debtors' preference counterclaims. The Debtors are to submit a draft judgment order within seven days hereof of their counterclaims are dismissed.

---

18. While it does appear that it was in the ordinary course of its business for Diamond to borrow money from investors without matching them to mortgages and to pay interest to those investors based on their investments, the fact remains that from the Sinenis' perspective the entire transaction was extraordinary. Therefore, the Sinenis cannot meet the requirements of section 547(c)(2)(A) with respect to the interest payment they received in July, 1986. The same analysis applies to the refund of the overpayment of principal.