PINE TOP INSURANCE
COMPANY, Plaintiff,

v.

CENTURY INDEMNITY COMPANY and
Bank of America National Trust and
Savings Association, Defendants.

No. 88 C 4330.

United States District Court,
N.D. Illinois, E.D.

June 8, 1989.

James R. Stinson, Holly A. Harrison,
Alan R. Dolinko and Brian J. Sullivan, Sidley & Austin, Chicago, Ill., for plaintiff.

David M. Spector, Thomas S. Kiriakos
and Susan M. Kozik, Jones, Mayer, Brown
& Platt, Chicago, Ill., for Century Indemnity.

Phil C. Neal, Neal, Gerber, Eisenberg &
Lurie, Chicago, Ill., for Bank of America.

## MEMORANDUM OPINION
## AND ORDER

SHADUR, District Judge.

Pine Top Insurance Company ("Pine Top"), an Illinois insurance company currently in liquidation under Illinois Insurance Code Art. XIII (Ill.Rev.Stat. ch. 73, ¶¶ 799–833.13 [1]), has sued Century Indemnity Company ("Century") and Bank of America ("Bank") under Insurance § 816(2) to recover two allegedly voidable preferential transfers. Count I of the First Amended Complaint ("Complaint") seeks to recapture one of the transfers from Century.

Century now moves alternatively (1) under Fed.R.Civ.P. ("Rule") 56(b) for summary judgment on Count I or (2) under Rule 12(b)(6) to dismiss Count I for failure to state a claim.[2] For the reasons stated in

---

1. Further references to the Insurance Code will be in the form "Insurance § —," referring to the numbering in the statutory compilation by Smith–Hurd. This opinion employs "§" rather than "¶" to conform to the General Assembly's continued usage of the former symbol, though Smith–Hurd shifted to the "¶" symbol a few years ago.

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the non-movant—in this case Pine Top (*DeValk Lincoln*

this memorandum opinion and order, Century's motion is denied in both respects.

### Facts [3]

Pine Top provided reinsurance coverage for Century in accordance with reinsurance treaties between them. Those treaties required Pine Top to reimburse Century for certain losses covered by the reinsured policies Century had initially issued. From time to time Century would require Pine Top to establish standby letters of credit ("LOCs") to secure its obligations under the treaties.

On February 10, 1986 [4] Bank issued a commitment letter to Pine Top in which Bank agreed to provide Pine Top with a $10 million line of credit conditioned upon the provision of specified collateral. That collateral comprised (1) Pine Top's current and future receivables, (2) $6.8 million in its short term notes and (3) a $3.2 million standby LOC previously issued by Bank to Pine Top on the account of Greyhound Corporation (Pine Top's parent corporation).

On February 26 Pine Top, to secure its then-existing open account obligations to Century under the treaties, drew on Bank's commitment by causing Bank to issue an approximately $2.9 million standby LOC in Century's favor. Then on March 18 Pine Top signed a security agreement (the "Agreement") with Bank, granting Bank a security interest in cash and securities in consideration for the line of credit extended in Bank's commitment letter. At about the same time Pine Top also granted a security interest to Bank in its reinsurance receivables and also assigned Greyhound's $3.2 million LOC to Bank pursuant to the terms of the commitment letter. Then on April 22 Pine Top actually transferred to Bank approximately $6.7 million of the collateral

described in the Agreement and in its other loan documents with Bank.

On June 23 the Illinois Director of Insurance filed a Verified Petition for the rehabilitation of Pine Top, and Pine Top was then placed into voluntary rehabilitation pursuant to the Illinois Insurance Code. On January 16, 1987 Pine Top was placed in liquidation and deemed insolvent.

Pine Top had in fact been insolvent since at least the preceding February 26 (when it first drew on Bank's commitment), and Century had reasonable cause to believe Pine Top was insolvent at and after that time. It was some time after June 23 that Century drew down the entire $2.9 million under the LOC previously issued in its favor.

Bank and Pine Top had intended the $10 million line of credit to be 100% collateralized up front (Tr. 31). Nonetheless, although the nature of the collateralization was set forth in the February 10 commitment letter, the collateral itself was not finally identified until the Agreement was signed on March 18. It was on that date that Bank was assigned the proceeds of the Greyhound LOC (P.Ex. 13). Even though the parties had generally agreed the entire transaction would proceed with dispatch (see, e.g., Tr. 67), the remainder of the collateral did not reach Bank until April 18 or 22.

It is undisputed that Bank liquidated Pine Top's pledged collateral to cover its loss when Century drew down on the LOC. Those are the proceeds now in dispute in Complaint Count I.

### Voidable Preference

■ Every LOC transaction is tripartite in nature. For that reason it necessarily

---

*Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir.1987)). Rule 12(b)(6) principles require this Court to accept as true all of Pine Top's well-pleaded factual allegations, again drawing all reasonable inferences in its favor (*Marmon Group, Inc. v. Rexnord, Inc.,* 822 F.2d 31, 34 (7th Cir.1987) (per curiam)). Those alternative motions call for related, though not identical, approaches.

**3.** Despite the somewhat different standards called for by Century's alternative motions (see n. 2), presentation of the facts is not too com-

plex: Apart from the Complaint itself, the only materials tendered in conjunction with the Rule 56 motion are the deposition of Robert Troutman (cited "Tr.—") and the exhibits to that deposition (cited "P.Ex.—" or "D.Ex.—" to conform to the parties' designations). Of course none of those materials will be considered for purposes of the Rule 12(b)(6) motion.

**4.** All further dates also refer to 1986 unless otherwise noted.

involves three sets of relationships—one between each pair of the parties (Debtor, Creditor and Issuer).

At the outset of the LOC transaction Debtor (here Pine Top) owes or will owe [5] Creditor (here Century) money (here under the reinsurance treaties). Issuer (here Bank) issues an LOC to Creditor to satisfy Debtor's obligations or anticipated obligations—in this case the LOC was standby in nature, assuring Creditor Century that Debtor Pine Top would honor its promise. As between Issuer Bank and Debtor Pine Top, the latter agreed to reimburse the former for any payout it might have to make, securing that promise with collateral.

In this case Pine Top agreed to and ultimately did collateralize the standby LOC in full. What fuels the current controversy is the timing of Pine Top's agreement and its delivery of the collateral.

There is no dispute that in February Pine Top already owed Century money pursuant to the reinsurance treaties. Thus the standby LOC provided security for an unsecured antecedent debt. And of course the existence of an antecedent debt that is unsecured (at least to some extent) is the hallmark of a voidable preference claim. That is the essence of the voidable preference provision under the Bankruptcy Code, 11 U.S.C. § 547(b),[6] and all parties treat judicial interpretations of that section as applicable to this case.

If viewed in isolation, neither Bank's issuance nor its honoring of the standby LOC constitutes a voidable preference as to Century. Only property of the debtor's estate can be the subject of a voidable preference under Insurance § 816(2) (cf. Bankruptcy § 547(b)), and an LOC and its proceeds are *not* property of the debtor's estate (*In re Compton Corp.*, 831 F.2d 586, 589 (5th Cir.1987) and cases cited there).

When the issuer honors a request under an LOC, it is perceived as doing so from its own assets.

Again if viewed as an isolated transaction, Pine Top's transfer of collateral to Bank also cannot be a *direct* voidable preference as to Century. After all, no property was transferred to Century in that transaction.

What Pine Top seeks to do is to telescope those two transfers into one having the effect of an "indirect transfer" of funds from Pine Top to Century (and thus being voidable as against Century). That "indirect transfer" concept is far from new: It was crystallized early in this century in *National Bank of Newport v. National Herkimer County Bank*, 225 U.S. 178, 184, 32 S.Ct. 633, 635, 56 L.Ed. 1042 (1912):

> To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another, for his benefit. If the bankrupt has made a transfer of his property, the effect of which is to enable one of his creditors to obtain a greater percentage of his debt than another creditor of the same class, circuity of arrangement will not avail to save it.

And it has recently been applied in the LOC context—first in *Compton*, then followed by *In re Air Conditioning, Inc. of Stuart*, 845 F.2d 293 (11th Cir.1988).

Thus *Compton*, 831 F.2d at 594 stated:

> We hold that a creditor cannot secure payment of an unsecured antecedent debt through a letter of credit transaction when it could not do so through any other type of transaction.

*Compton, id.* at 595 emphasized that its holding did not overturn any prior LOC law or any established perception of how LOCs allocated risks. *Air Conditioning*, 845 F.2d at 296–97 has concurred enthusiastically in the *Compton* analysis.

---

**5.** Future or contemplated future debt, rather than current debt, is the subject of the typical non-standby LOC. If the debt were currently due and owing and intended to be paid currently, a simpler form of commercial document (a check or bank draft) would be all that would be needed. This case illustrates still another use of the LOC: providing for a current debt of the Debtor, with Issuer furnishing assurance via a standby LOC that Debtor would in fact pay that debt.

**6.** Further references to the Bankruptcy Code will take the form "Bankruptcy § —," referring to the numbering in Title 11.

Century does not dispute either the logic or the holding of those cases. Instead it urges they are inapplicable to the facts of this case. In *Compton* the LOC was fully collateralized when it was issued, due to a prior security agreement and a contemporaneous promissory note. In *In re Air Conditioning*, 55 B.R. 157, 159 (Bankr.S.D. Fla.1985) the bankruptcy court noted the LOC was secured by a certificate of deposit, and the issuer perfected its security interest in the certificate within seven days after the LOC issued. Century R.Mem. 10 concludes the *Compton–Air Conditioning* rule requires that the two events (issuance and collateralization of the LOC) be "substantially contemporaneous," or that there be a causal relationship between the improvement of Creditor's position (issuance of the LOC) and the depletion of Debtor's assets (collateralization).

Like the "indirect transfer" concept, the "substantially contemporaneous" doctrine is well-rooted in precedent. First identified in *Dean v. Davis*, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), it is normally invoked in the bankruptcy context under Bankruptcy § 547(c)(1). *Dean* held a debtor's transfer of property one week after the making of the loan secured by that transfer was *not* a preference because (1) the parties had intended from the beginning that the loan be secured and (2) the two transactions were "substantially contemporary."[7]

Development of the substantially-contemporaneous-exchange doctrine in the bankruptcy context has been colored by Bankruptcy § 547(e)(2)(A), which relates back a security interest perfected within ten days after the original transfer. Essentially that provides a ten-day grace period to provide security. Century relies on a series of bankruptcy court decisions such as *In re Damon*, 34 B.R. 626, 630 (Bankr.D. Kan.1983) to conclude that a transfer of security *more* than ten days after the underlying loan is prima facie not contemporaneous.

Even taken on its own terms, that argument would not necessarily carry the day. There is a separate line of cases (typified by *In re Arnett*, 13 B.R. 267 (Bankr.E.D. Tenn.1981), *aff'd*, 17 B.R. 912 (E.D.Tenn. 1982)) that rejects Bankruptcy § 547(e) as defining the exclusive limitation on Bankruptcy § 547(c). Those cases look at the initial intent of the parties even if the security transfer takes place more than ten days later. And because the Illinois Insurance Code has no provision corresponding to Bankruptcy § 547(e), there would seem to be even less reason to be bound exclusively by a ten-day cutoff here.

But the premise that Century's argument should be taken on its own terms is itself false. This LOC situation was of course much more complex than the standard contemporaneous exchange scenario—say that in which an automobile lien is perfected after the loan has been made. There the contrast between a voidable preference and a non-voidable for-value exchange (as always, a function of whether the debtor's estate was or was not diminished in favor of the creditor) is determined by the timing—or what is treated as the timing—of the two transactions. If the debtor receives or is considered as having received fresh money (in the hypothesized example, loan proceeds) at the same time the debtor has parted with its property (in the example, a lien on its automobile), the net estate is undiminished and preexisting creditors cannot complain: They share in the same pot as before. But if the debtor has already received a loan without any contemplated giving of security, its enlarged estate (its prior assets plus the loan proceeds) is treated as the pot in which the preexisting creditors (and the new lender) are entitled to share. If thereafter the new lender is preferred by being given security sufficiently close to the date the law designates as the measuring point for voidability, the other creditors (or their surrogate, the receiver or trustee or debtor itself) can

---

**7.** Some scholars believe Section 547(c)(1) was simply a codification of *Dean* (see, e.g., Duncan, *Delayed Perfection of Security Interests in Per-* *sonal Property and the Substantially Contemporaneous Exchange Exception to Preference Attack*, 62 Neb.L.Rev. 201, 210 (1983)).

attack the transfer.[8]

Although that line of analysis—including the way in which it looks at the timing as between (1) the creditor's parting with its property to benefit the debtor and (2) the debtor's delivery of security—might profitably apply to *some* LOC situations (say the establishment of a standby LOC arrangement before the creditor ever begins to extend credit), it is totally inapropos here. It must be remembered that Pine Top owed Century money under the treaty (an unsecured obligation) *before* it caused Bank to issue the LOC in Century's favor. *That* sequence, and not the relative timing of the issuance and collateralization of the LOC, is the principal key to the existence of a voidable preference. Had Pine Top turned over assets to Bank to secure the concurrent issuance of an LOC to Century because of a preexisting debt Pine Top owed Century, the "indirect transfer" concept would have rendered that turnover voidable as a preference. And if (as here) the turnover of assets came even later, the preexisting debt was if anything *more* antecedent, so the preference concept should apply a fortiori.

Hence the only question that needs to be answered is whether, as the issue was posed in *Compton,* 831 F.2d at 594:

> The purpose of the letter of credit transaction in this case was to secure payment of an unsecured antecedent debt for the benefit of an unsecured creditor. This is the only proper way to look at such letters of credit in the bankruptcy context.

For that purpose *Compton, id.* reasoned—in language equally applicable to the situation described in Pine Top's Complaint and the other materials submitted on the current motion:

> The promised transfer of pledged collateral induced the bank to issue the letter of credit in favor of the creditor. The increased security interest held by the bank clearly benefitted the creditor because the bank would not have issued the letter of credit without this security. A secured creditor was substituted for an unsecured creditor to the detriment of the other unsecured creditors.

In like manner, the District Court in *Air Conditioning,* 72 B.R. 657, 660–61 (S.D. Fla.1987) also focused on whether the bank intended the entire transaction to be one in which the debtor provided security for the LOC. On appeal the Court of Appeals, 845 F.2d at 296 noted "the promised transfer of the certificate of deposit induced American Bank to issue the letter of credit in the first place."

*Compton,* 831 F.2d at 595 described its goal as that of preventing an unsecured creditor from avoiding a preference attack through the use of an LOC to secure payment of an antecedent debt. Here Century clearly attempted to secure Pine Top's prior debt with the LOC. Bank's intent was to provide the LOC in exchange for 100% collateralization, and not to shift the burden of Pine Top's insolvency. Those things being true, Century should be precluded from receiving a greater percentage of its claim than other creditors.

It may be too early to tell whether Pine Top will be able to deliver the facts as advertised in its Complaint. For the present it need only be decided that Century cannot prevail with all reasonable factual inferences drawn in Pine Top's favor. Century's motion for summary judgment on Count I is therefore denied.[9]

### *Reasonable Cause*

■ Century has also moved to dismiss Count I for insufficiency under Rule

---

**8.** That approach is not, of course, the only one the law could take. It might be possible to apply for example a sort of LIFO approach, in which a creditor who has most recently enriched the estate by extending credit in the form of money or goods would be entitled to recapture that new value via a preference, on the theory that the earlier creditors would then be no worse off than if the later credit had never been extended in the first place. But that sort of rule, though arguably just as fair as the one

the law has chosen instead, would be a good deal more difficult to administer as a practical matter.

**9.** Because all the facts are not before this Court on the present motion, this opinion should not be misread as a holding that Pine Top would necessarily be entitled to a summary judgment against Century.

12(b)(6), contending the Complaint does not adequately allege that Century had reasonable cause to believe it was receiving a preference. That motion too is meritless.

Insurance § 816(2) renders a preference voidable only if the creditor had reasonable cause to believe a preference would occur. Although ¶ 16 alleges Century had reasonable cause to believe Pine Top was *insolvent* at the time the LOC issued, Century argues that is insufficient.

Both litigants agree the Illinois Insurance Code is analogous to Section 60(b) of the Bankruptcy Act of 1898 (and the 1938 amendments) in terms of the "reasonable cause to believe" clause. Under the jurisprudence of that bankruptcy section, it was enough that the creditor had reasonable cause to believe the debtor was insolvent (see, e.g., the Ponzi scheme case, *Cunningham v. Brown*, 265 U.S. 1, 10–11, 44 S.Ct. 424, 426, 68 L.Ed. 873 (1924)).

Century advances two arguments in an effort to escape that result:

1. It claims an exception exists where a creditor knows the debtor is insolvent but honestly believes the debtor will continue in business and realize enough money to pay its debts in full.

2. It contends that because (a) a preference occurs only if the LOC was collateralized when it was originally issued and (b) Century had no reason to believe the LOC was in fact collateralized, Century could not have reasonably believed there was a preference.

Both those arguments must be rejected, for on the current Rule 12(b)(6) motion this Court is bound by the allegations in the Complaint and all facts reasonably inferred from those allegations.

As for Century's first argument, it is entirely at odds with the Complaint's allegations that Pine Top was insolvent and Century knew so at the time of the LOC's issuance. No reasonable inference could be drawn to support the proposition that Century nevertheless believed Pine Top would be able to remain solvent.

Century's second contention fails for more than one reason. Its first premise has been shown to be flawed in the *Voidable Preference* section of this opinion. But even were that not so (and Century cites no legal authority to support its contrary position), it is still a reasonable inference from the Complaint that Century could have believed the LOC was intended to be collateralized from the outset. At the very least, given the ¶ 21 allegation of a preferential transfer, it would be improper to dismiss the Complaint on the ground that there was no such transfer in fact.

In sum, Century's alternative motion suffers the same fate as its first. It too must be denied.

### Conclusion

Century's alternative motion for summary judgment on, or for dismissal of, Count I is denied in its entirety. This action is set for a status hearing at 9 a.m. June 16, 1989 to discuss future proceedings in this action.