969 F.2d 321
 61 USLW 2110, 23 Bankr.Ct.Dec. 519, Bankr.
L. Rep. P 74,767
 PINE TOP INSURANCE COMPANY, in Liquidation, an insolvent
Illinois corporation, Plaintiff-Appellant,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, a
California Corporation, Defendant-Appellee.
PINE TOP INSURANCE COMPANY, in Liquidation, an insolvent
Illinois corporation, Plaintiff-Appellant,
v.
CENTURY INDEMNITY COMPANY, a Connecticut Corporation, and
Bank of America National Trust and Savings
Association, a California Corporation,
Defendants-Appellees.
 Nos. 91-1175, 91-1361.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 23, 1992.
Decided July 17, 1992.
As Amended July 22, 1992.
 
 James R. Stinson, Susan A. Stone, Holly A. Harrison (argued), Todd C. Jacobs, Sidley & Austin, Chicago, Ill., for Pine Top Ins. Co.
 David M. Spector, Michele Odorizzi, Nancy K. Linnerooth, Jane Van Duzer, Mayer, Brown & Platt, Chicago, Ill., for Century Indem. Co.
 Phil C. Neal (argued), Lawrence Benjamin, Ralph T. Russell, Neal, Gerber & Eisenberg, Chicago, Ill., for Bank of America Nat. Trust and Sav. Assn.
 Alan R. Dolinko, Chuhak & Tecson, Chicago, Ill.,
 Before COFFEY, FLAUM and RIPPLE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 This is a consolidated appeal of two diversity suits brought by the Illinois Department of Insurance (Department), as liquidator of the Pine Top Insurance Company (Pine Top), to recover allegedly preferential transfers made to several of Pine Top's creditors just prior to going into liquidation. In opinions rendered just eleven days apart, two district courts separately concluded that one of those creditors, the Bank of America National Trust and Savings Association (Bank or Bank of America), a defendant in both suits, did not receive a preferential transfer and granted summary judgment in its favor. See Pine Top Ins. Co. v. Century Indem. Co., 123 B.R. 287 (N.D.Ill.1990); Pine Top Ins. Co. v. Republic Western Ins. Co., 123 B.R. 277 (N.D.Ill.1990).
 
 
 2
 Both courts denied summary judgment motions filed by the remaining creditors, Republic Western Insurance Company (Republic) and Century Indemnity Company (Century), and the two cases remained pending against them. However, Pine Top and Republic subsequently settled their dispute, making the Bank's dismissal in the Republic case final and appealable. Consequently, the Bank moved for entry of a partial final judgment in the Century case, pursuant to Fed.R.Civ.P. 54(b), to permit Pine Top to appeal the Bank's dismissal from that suit in tandem with its dismissal from the Republic suit, thereby avoiding the possibility of sequential appeals involving identical issues. We consolidated the two cases on joint motion of the parties, and thus the only issue before us is whether the district courts properly granted summary judgment to the Bank. For the reasons offered below, we conclude that the courts acted properly and affirm.I.
 
 
 3
 Before going into liquidation, Pine Top was in the casualty insurance business as a direct insurer and as a reinsurer. Among its reinsurance clients were Republic and Century who, from time to time, would require Pine Top to establish standby letters of credit (LOCs) to secure Pine Top's reinsurance obligations (i.e., outstanding insurance losses) to them. This is a common practice in the industry and one often required by state regulatory authorities.
 
 
 4
 By early 1986, Pine Top teetered on collapse: its reserves had fallen from $12.6 million to $1.8 million during the prior year and many states had prohibited it from writing any new business. Moreover, its existing LOCs had expired and it faced difficulty arranging new ones. Pine Top's parent company, The Greyhound Corporation (Greyhound), came to its aid by seeking on its behalf, a new $10 million LOC from the Bank of America to cover Pine Top's reinsurance obligations. Greyhound, who had a long-standing relationship with the Bank, approached the bank officer assigned to its account, Robert Troutman, explaining Pine Top's desperate situation. Troutman obtained verbal approval to extend the LOC to Pine Top on February 7, 1986, and followed up three days later with a commitment letter, stipulating that the LOC would by secured by three sources of collateral: (1) Pine Top's present and future reinsurance receivables, valued at approximately $16 million (the receivable collateral); (2) $6.8 million in cash or short-term investments (the cash collateral); and (3) proceeds from a $3.2 million LOC to be issued by the Bank in Pine Top's favor, on Greyhound's account (the Greyhound LOC). The letter further stated that the credit commitment would expire if not accepted by Pine Top in writing by March 18, 1986.
 
 
 5
 This letter failed, however, to specify a deadline by which Pine Top was required to turn over the necessary collateral and, not surprisingly, Pine Top and Greyhound were dilatory in transferring it to the Bank. Even though the collateral had not yet been properly transferred to the Bank, it went ahead, at Greyhound's behest, and issued several LOCs to cover Pine Top's reinsurance obligations. On February 26, 1986, the Bank mailed one LOC to Century in the amount of $2,875,961 (which Century received on March 4) and one LOC to Republic in the amount of $969,642 (which Republic received on an unknown date).
 
 
 6
 The collateralization of these LOCs remained incomplete until March 18, 1986, when Pine Top executed four documents: (1) the commitment letter; (2) a Security Agreement giving the Bank an interest in the receivable collateral; (3) a Security and Investment Agreement giving the Bank an interest in the cash collateral; and (4) an assignment of the proceeds of the Greyhound LOC collateral. Due to a delay in putting together attestations from Pine Top's Board of Directors giving its officers authority to acquire this debt, Pine Top did not actually deliver these documents to the Bank until April 18.[1]
 
 
 7
 In any event, the effort to resuscitate Pine Top proved fruitless. Republic and Century subsequently drew upon their LOCs for the full amount owed by Pine Top, Republic on June 23, 1986, and Century on December 29, 1986; in both instances, the Bank honored the drafts and then reimbursed itself by liquidating collateral held under the security agreements with Pine Top.
 
 
 8
 The Department placed Pine Top into receivership on June 23, 1986, and, after rehabilitation proved futile, into liquidation on January 16, 1987. See Ill.Rev.Stat. ch. 73, pp 799 et seq. The Department, as liquidator, is charged with marshalling the assets of Pine Top's estate for the benefit of all Pine Top creditors. Pursuant to its charge, the Department brought the aforementioned diversity suits, one against Republic and the Bank, and one against Century and the Bank, alleging that they received a voidable transfer from Pine Top within the four-month statutory preference period preceding commencement of receivership. See id. at p 816(2).[2]
 
 
 9
 The policy underlying the voidable preference doctrine, whether under state insurance law or federal bankruptcy law, is singular: to prevent creditors from obtaining satisfaction of their claims on the eve of liquidation to the detriment of other similarly situated creditors. Accordingly, when confronted with a voidable preference dispute under state insurance law, it is customary to look to federal bankruptcy law for guidance. See, e.g., People ex rel. Gerber v. Central Casualty Co., 37 Ill.2d 392, 226 N.E.2d 862, 866 (1967). Because the Illinois Insurance Code was enacted in 1937, the Bankruptcy Act of 1898, rather than the Bankruptcy Code of 1978, is considered most germane to its interpretation. See Stamp v. Insurance Co. of N. Am., 908 F.2d 1375, 1382 (7th Cir.1990).
 
 
 10
 Although Pine Top clearly transferred assets (the receivables, the cash, and the Greyhound LOC) to the Bank sometime within the four-month preference period, both district courts concluded this transfer was not a voidable preference under a well-established exception known as the "substantially contemporaneous exchange" rule. First delineated in Dean v. Davis, 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), and subsequently codified in the Bankruptcy Code, 11 U.S.C. § 547(c), this rule provides that a transfer of assets from a debtor to creditor within the statutory preference period cannot be voided if (1) the parties intended that the transfer be part of a contemporaneous exchange for new value given to the debtor, and (2) the transfer was, in fact, substantially contemporaneous. The justification for this exception is that transferring collateral in exchange for an infusion of new capital does not harm existing creditors because it does not diminish the debtor's net assets. See generally 4 Collier on Bankruptcy, p 547.09 at 547-45 (Lawrence King 15th ed. 1992); Vern Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand.L.Rev. 713, 759-67 (1985). Here, the district courts held that the transfer of collateral to the Bank, despite the fact that it occurred two to three weeks after issuance of the LOCs, met both prongs of the Dean test because it was intended to be a contemporaneous exchange for new value and was in fact such an exchange.[3] Pine Top asserts on appeal that the district courts erred in reaching this conclusion.
 
 
 11
 We review de novo a district court's grant of summary judgment, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), viewing the record and all inferences drawn from it in the light most favorable to the nonmovant to determine if any genuine issues of material fact are present. Fed.R.Civ.P. 56(c); Brownell v. Figel, 950 F.2d 1285, 1289 (7th Cir.1991).[4] In reaching our decision here, we rely heavily on the well-reasoned opinions of the two district courts.
 
 II.
 
 12
 Pine Top maintains that the district courts made three errors in granting summary judgment to the Bank: (1) in finding that Pine Top and the Bank had intended to make a substantially contemporaneous exchange; (2) in narrowing the gap between issuance of the LOCs and transfer of the collateral from eight to under three weeks; and (3) in finding that there was in fact a substantially contemporaneous exchange despite the two to three week delay.
 
 A.
 
 13
 Pine Top first asserts that an issue of fact remains as to whether the parties intended a contemporaneous exchange for new value. Most telling, according to Pine Top, is the Bank's own conduct: it issued the LOCs on February 26, even though Pine Top had neither signed the commitment letter nor transferred any of the required collateral. Moreover, the parties never agreed, in the commitment letter or elsewhere, on a deadline for transferring collateral. Pine Top maintains that the Bank chose to issue the LOCs without first obtaining security as a favor to Greyhound and that the Bank's "consent to become a general creditor for an hour, even if not intended to have that effect, by the liberty allowed [Pine Top], broke the continuity and established the loan as part of [Pine Top's] estate." See National City Bank v. Hotchkiss, 231 U.S. 50, 58, 34 S.Ct. 20, 21-22, 58 L.Ed. 115 (1913). According to Pine Top, this raises, at minimum, a question of fact as to the parties' intent, and the highly subjective, fact-specific nature of any intent inquiry makes it particularly unsuitable for resolution at the summary judgment stage. See T.I. Swartz Clothiers, Inc. v. Union Trust Co. of Maryland, 15 B.R. 590, 592-94 (Bankr.E.D.Va.1981).
 
 
 14
 We agree with the district courts that evidence in the record demonstrates, without contradiction, that the Bank never consented to be a general creditor of Pine Top, and that both parties intended this LOC transaction to be a fully secured, substantially contemporaneous exchange for new value. First, and of primary importance, the Bank's commitment letter clearly states that Pine Top must furnish collateral as a "condition" of credit. Second, Troutman, the bank officer who negotiated the transaction, testified that he assumed that Pine Top would furnish the collateral "as soon as the documentation could be drafted and presented" and that the Bank would "have the collateral prior to issu[ing] any [LOCs]." Century Rec. 162-1; Troutman Dep. I 43-45. None of the other participants in the negotiations, all of whom were deposed, contradicted this testimony. Finally, Pine Top's intent to contemporaneously secure these LOCs is manifested by two letters it wrote to the Deputy Director of the Department, one on February 19, 1986, and one on February 25, 1986, and by a third letter Greyhound wrote to the Bank on February 19, 1986, all of which characterized the parties' dealings as a secured transaction.
 
 B.
 
 15
 Pine Top next argues that the district courts erroneously narrowed the gap between issuance of the LOCs and transfer of the collateral from eight weeks to under three weeks. This shorter time frame in turn lead the courts to mistakenly conclude, under the second prong of Dean, that the transfer of collateral was in fact substantially contemporaneous with the issuance of the LOCs.
 
 
 16
 As noted, three forms of collateral were transferred from Pine Top to the Bank: the reinsurance receivables, the cash collateral, and the Greyhound LOC. All of the documents necessary to complete the transfer to the Bank of the receivables were executed by Pine Top on March 18; however, some, but not all, of the documents necessary to complete the transfer to the Bank of the Greyhound LOC and the cash collateral were executed on March 18. To complete the Bank's security interest in these latter two forms of collateral, the Bank and Greyhound had to take two additional steps, see supra note 1, and these were not completed until April 17 and 22; hence, the Greyhound LOC and the cash collateral were arguably not actually transferred to the Bank until these dates. At any rate, all parties agree that the latest possible date for transfer of the Greyhound LOC was April 17 and for the cash collateral, April 22.
 
 
 17
 Given this chronology of events, both district courts concluded that the Bank was fully secured no later than March 18, 1986. The district court in Century relied on the substitution of collateral doctrine, which establishes that a substitution of collateral is not preferential if the debtor's estate is not diminished by the substitution. See Sawyer v. Turpin, 91 U.S. 114, 120-21, 23 L.Ed. 235 (1875) (swapping one form of collateral for another not a preference "if the security given up is a valid one when the exchange is made, and if it is undoubtedly of equal value with the security substituted for it"); see also In re Pitman, 843 F.2d 235, 241 (6th Cir.1988) (voidable preference must "impair" or "diminish" the estate). The district court determined that the security agreement Pine Top executed on March 18 clearly assigned to the Bank an interest in Pine Top's $16 million in reinsurance receivables. Hence, according to the court, the transfer of the cash collateral and the Greyhound LOC to the Bank in March, even if preferential, did not result in a net diminution of Pine Top's estate because the Bank was already fully secured by the reinsurance receivables. That conclusion meant that a two-week gap had transpired between receipt of the LOC by Century on March 4, and transfer of the receivable collateral to the Bank on March 18.[5] The district court held that, despite the two-week delay, this was in fact a substantially contemporaneous exchange and dismissed the Bank from the suit.
 
 
 18
 The district court in Republic reached the same conclusion under a different approach, relying instead on the composite documents doctrine which establishes that the collateral given under a security agreement need not be described within the four corners of that security agreement, but may also be adequately described in collateral documents executed pursuant to the transaction. See Wambach v. Randall, 484 F.2d 572 (7th Cir.1973); In re Data Entry Serv. Corp., 81 B.R. 467, 469 (Bankr.N.D.Ill.1988). The court concluded that although the documents Pine Top executed on March 18 failed to adequately identify the specific sources of collateral Pine Top was providing to the Bank, see Ill.Rev.Stat. ch. 26, §§ 9-110, 9-203, an enforceable security agreement nonetheless arose on March 18 because the Greyhound LOC and the cash collateral were adequately identified in several collateral documents. That conclusion meant, however, that a three week gap existed between issuance of the LOC to Republic on February 23, and transfer of the Greyhound LOC and cash collateral on March 18. The court held that, despite the three week delay, this was in fact a substantially contemporaneous exchange and dismissed the Bank from the suit.
 
 
 19
 Pine Top asserts that neither doctrine is applicable to the facts of this case. The substitution of collateral doctrine is inapplicable, according to Pine Top, because whether its receivables were really worth $16 million remains an issue of fact.[6] If, indeed, they had little or no value, then the Bank was not fully secured on March 18 and the foundation for the substitution of collateral doctrine--which only applies if the substituted collateral is of equal or greater value--crumbles. In support of this contention, Pine Top argues the record lacks any evidence that the receivables were really worth $16 million and further maintains that some evidence in the record suggests the receivables may have in fact been uncollectible. First, the Greyhound LOC contained language stating that it was redeemable in the event that Pine Top's receivables were uncollectible, casting doubt on the value of the receivables. Second, when Pine Top drew on the Greyhound LOC on June 16, 1986, just prior to its demise, it represented in the sight draft that it had "made its best effort to collect the indebtedness due from its reinsurer ... and payment has not been made." Republic Rec. at 154; Ex. O.
 
 
 20
 We reject Pine Top's argument and conclude that the Bank was fully secured on March 18. It is undisputed that Pine Top executed a security agreement on March 18 that "assign[ed] and transfer[ed]" to the Bank a security interest in Pine Top's reinsurance receivables, valued at approximately $16 million. That document was executed in direct compliance with the Bank's demand for security in the commitment letter of February 10. Moreover, it clearly "transfers" security to the Bank in an amount, $16 million, that exceeds the indebtedness that the Century ($2,875,961) and Republic ($969,642) LOCs created.
 
 
 21
 Contrary to Pine Top's assertion, the record contains undisputed evidence that the receivables were, indeed, valued at $16 million. Pine Top's financial statement, dated September 30, 1985, and available at the time the transaction was consummated, listed the value of Pine Top's receivables at $16 million. Pine Top has never disputed that value[7] and nothing in the record contradicts it. The representation by Pine Top in the sight draft drawing on the Greyhound LOC simply declares that it attempted to collect its receivables and "payment has not been made." This says nothing about the value of the receivables or whether they were actually collectible. Moreover, the relevant issue is not whether the receivables were uncollectible when Pine Top drew on the Greyhound LOC (June 16, 1986), but, rather, the value when the security agreement was created on March 18. Nothing in the record suggests the receivables were worth less than $16 million on that date.
 
 
 22
 Regarding the language in the Greyhound LOC identifying it as backup collateral in the event Pine Top's receivables were uncollectible, that, too, does not prove the receivables were, in fact, uncollectible. Rather, it shows the very purpose of the Greyhound LOC: to give the Bank the option of promptly reimbursing itself out of Greyhound's account in the event of default, rather than having to commence proceedings to pursue the receivables. Because we conclude that the Bank was fully secured by the reinsurance receivables on March 18, we need not address whether the Bank was also fully secured on that date under the composite documents doctrine.C.
 
 
 23
 Finally, Pine Top argues that, even if the courts properly found a two- to three-week gap, such a delay is still not in fact substantially contemporaneous under Dean. See, e.g., In re Arnett, 731 F.2d 358, 363 (6th Cir.1984) (33-day delay not in fact substantially contemporaneous); In re Great Lakes Lumber Co., 8 F.2d 96 (W.D.Penn.1925) (same for six-day delay); In re Hudson Valley Quality Meats, Inc., 29 B.R. 67, 77-78 (Bankr.N.D.N.Y.1982) (same); In re Arctic Air Conditioning, Inc., 35 B.R. 107, 109 (Bankr.E.D.Tenn.1983) (same for 30-day delay). Pine Top maintains that the courts erred in focusing on the intent prong of Dean to the exclusion of the prong requiring temporal proximity between transfers. Such an elastic notion of contemporaneity collapses Dean into virtually a single-prong test, invites uncertainty among existing creditors, and creates disincentives for creditors to act promptly when securing newly furnished credit to faltering debtors. Pine Top argues that, the parties' intentions aside, the fact that it took them three weeks to get the LOCs secured defeats any notion of contemporaneity. The Bank's conduct, Pine Top contends, highlights this fact: Troutman made repeated calls to Pine Top and Greyhound, after he had already issued the LOCs, urging them to execute the necessary documents promptly. The Bank apparently realized that its failure to promptly acquire security for the LOCs had transformed it into a general rather than secured creditor. See In re Matter of Diamond Mortgage Corp., 78 B.R. 196, 202 (Bankr.N.D.Ill.1987) (holding that a 6-week delay in transferring collateral, combined with several calls by the creditor complaining of the delay, precluded a finding of substantial contemporaneity).
 
 
 24
 We reject Pine Top's argument. The focus of the "in fact" prong of the Dean test is obviously on the temporal proximity between the issuance of credit and transfer of assets to secure that credit. However, the modifier "substantial" makes clear that contemporaneity is a flexible concept[8] which requires a case-by-case inquiry into all relevant circumstances (e.g., length of delay, reason for delay, nature of the transaction, intentions of the parties, possible risk of fraud) surrounding an allegedly preferential transfer. We conclude that the two- to three-week delay here did not defeat the substantially contemporaneous nature of this exchange. See, e.g., In re Martella, 22 B.R. 649, 653 (Bankr.D.Colo.1982) (45 days); In re Lyon, 35 B.R. 759, 763 (Bankr.D.Kan.1982) (20 days); In re Burnette, 14 B.R. 795, 803 (Bankr.E.D.Tenn.1981) (20 days); In re Paul Delaney Co., 26 F.2d 937, 940 (W.D.N.Y.1928), aff'd, 30 F.2d 1018 (2d Cir.1929) (several months).[9] The circumstances of this transaction shed light on the delay. Pine Top was in dire financial straits and desperately needed new credit to cover its reinsurance obligations. The Bank, fully apprised of this situation, stepped in to provide that credit at the request of its longtime customer Greyhound. From the outset, Pine Top agreed to the Bank's demand for security in exchange for this new credit, and all documents surrounding this transaction corroborate this understanding. Because of the urgency of the situation, the Bank went ahead and issued the LOCs before the security agreements were in order. Although it took several weeks to execute all of the necessary documents, immediate steps were taken to begin the process of collateralization. Significantly, nothing suggests the parties ever retreated from that understanding of the transaction.
 
 
 25
 This case fits squarely outside the justification for voiding certain transfers made on the eve of bankruptcy or liquidation. The Bank was a new creditor, offering new capital to a struggling debtor, and it conditioned that new credit on the provision of security; a delay of three weeks in transferring that security did not defeat the legitimate expectations of Pine Top's other creditors because the net available assets were not diminished by the Bank's entrance into the pool of creditors. Cf. Continental and Commercial Trust & Savings Bank v. Chicago Title & Trust Co., 229 U.S. 435, 443-44, 33 S.Ct. 829, 831-32, 57 L.Ed. 1268 (1913). Because this inconsequential delay did not defeat the legitimate expectations of Pine Top's other creditors, the Bank was properly dismissed from these suits.
 
 
 26
 AFFIRMED.
 
 
 
 [1]
 Two other documents were also issued to round out the collateralization effort. The Bank issued to Pine Top a $3.2 million LOC on Greyhound's account on April 17, pursuant to Pine Top's assignment of this LOC back to the Bank, and Greyhound transferred $6.8 million in cash to the Bank on April 22, pursuant to the Security and Investment Agreement. This delay will become relevant later, as Pine Top argues that this delay meant that the LOCs issued by the Bank were not in fact properly secured by the Greyhound LOC and the cash collateral on March 18, but rather on April 17 and April 22, respectively
 
 
 [2]
 This statute provides in relevant part:
 Any transfer of, or lien upon, any property of any company made or created within four months prior to the filing of a complaint under this article, which gives to any creditor or policyholder or enables him to obtain a greater percentage of his debt than any other creditor or policyholder in the same class, which is accepted by a creditor or policyholder having reasonable cause to believe that such a preference will occur, shall be voidable.
 Ill.Rev.Stat. ch. 73, p 816(2).
 
 
 [3]
 The district court in the Century case went on, in a very thorough opinion, to support its decision on two alternate grounds: the doctrine of equitable liens, and the "reasonable cause to believe" language of § 816(2) (providing a defense to any creditor who did not have "reasonable cause to believe" that a preference would occur). See Pine Top Ins. Co. v. Century Indemnity Co., 123 B.R. 287, 295, 298. Given our ultimate agreement with both courts that this was a substantially contemporaneous exchange, we need not address these alternate grounds for affirmance
 
 
 [4]
 Neither party's brief makes mention of the proper standard of review in this case. (Effective February 1, 1992, under Circuit Rule 28(k), the proper standard of review should be included in all briefs submitted to this Court. See Etter v. Pease Constr. Co., Inc., 963 F.2d 1005, 1008 (7th Cir.1992).) At oral argument, the Bank suggested that even though this was an appeal of a summary judgment motion, we should apply the clearly erroneous standard, rather than the traditional de novo standard, because both district court decisions involved nonjury cases which entailed the application of a legal standard to arguably undisputed facts. See Central States Pension Fund v. Slotky, 956 F.2d 1369, 1373 (7th Cir.1992). Because we would affirm under either standard of review, we need not address this last-minute contention
 
 
 [5]
 The district court in Century, unlike the district court in Republic, measured the gap from the date of receipt (March 4), rather than the date of issuance (February 23). (Recall that the trial judge in Republic was not working with a known date of receipt.) The date of receipt, if known, is the proper measure because a letter of credit is not "established" under the Uniform Commercial Code until received. U.C.C. § 5-106(1)(b); Ill.Rev.Stat., ch. 26, p 5-106(1)(b). In situations such as this when a date of receipt is unknown, a good rule of thumb is to add three days to the mailing date. Cf. Fed.R.Civ.P. Rule 6(e). Under this approach, Republic received the LOC no earlier than Monday, March 1, 1986. Under either approach, the outcome is the same on the facts of this case because the difference between date of mailing and date of receipt is too negligible to be outcome determinative
 
 
 [6]
 The Bank argues that Pine Top waived this valuation argument by not raising it below. We disagree. The substitution of collateral doctrine, on which the district court ultimately relied, was raised for the first time in the Bank's summary judgment reply brief. See, e.g., Hedge v. County of Tippecanoe, 890 F.2d 4 (7th Cir.1989). Accordingly, Pine Top is entitled to make this argument on appeal
 
 
 [7]
 Indeed, on more than one occasion Pine Top seems to confirm that the receivables were valued at $16 million. As evidence of the Bank's knowledge of Pine Top's insolvency, Pine Top asserted before the district court that the "[receivable] collateral amounted to nearly 250% of the value of the credit line," Republic Rec. at 147; Pl.'s Resp. p 5; Pl.'s Statement of Add'l Facts p 6, and here on appeal that the Bank took "collateral in the amount of $16 million over and above" its exposure on the LOCs. See Pl.'s Br. at 41
 
 
 [8]
 In the bankruptcy context, contemporaneity is often defined by virtue of 11 U.S.C. § 547(e)(2)(A), which creates a ten-day grace period in which to perfect a security interest and avoid preference liability. See Pine Top Ins. Co. v. Century Indemnity Co., 716 F.Supp. 311, 314 (N.D.Ill.1989). Many bankruptcy decisions therefore consider a delay of more than ten days to be prima facie not contemporaneous, see, e.g., In re Damon, 34 B.R. 626, 630 (Bankr.D.Kan.1983), although this is at most a guideline here because the Illinois Insurance Code lacks a provision corresponding to § 547(e)
 
 
 [9]
 Pine Top disputes the precedential value of several of these cases on the ground that they involve "perfection" rather than "creation" of a security interest. This argument lacks merit. The Bankruptcy Code dictates that security is "transferred" on the date of perfection; it follows that for purposes of the contemporaneous exchange doctrine, any delay must be measured from the date of perfection. However, perfection is not required under pre-1938 bankruptcy law, see Hirschfeld v. Nogle, 5 F.Supp. 234, 238 (E.D.Ill.1933), and therefore is not determinative in establishing the date of transfer under § 204 of the Illinois Insurance Code